UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MFP EAGLE HIGHLANDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-0424-DFH-WTL |
| vs. | ) | |
| | ) | |
| AMERICAN HEALTH NETWORK | ) | |
| OF INDIANA, LLC, LALR | ) | |
| ENTERPRISES, LLC, LAWRENCE | ) | |
| A. REITZ, M.D. and LAURENCE M. | ) | |
| ADAMS, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.     PRELIMINARY STATEMENT

Defendants LALR Enterprises, LLC ("LALR"), Lawrence A. Reitz, M.D. ("Reitz"), and Laurence M. Adams, M.D. ("Adams") (sometimes collectively, "Defendants"), respectfully file this brief in support of their accompanying Defendants' Motion for Summary Judgment.  As explained below, Defendants are entitled to judgment as a matter of law that the plaintiff take nothing against them by its Amended Complaint.

While the Amended Complaint of the plaintiff MFP Eagle Highlands, LLC ("MFP"), alleges a variety of legal theories that are refuted in due course below, this case really turns on a simple question of contract interpretation.  That question is whether the lease upon which MFP sues entitled Defendant American Health Network of Indiana, LLC ("AHN") to assign such lease to a limited liability

company or LLC comprised of Reitz and Adams, i.e., LALR.  Because the answer to that question is yes, all of MFP's case falls apart.

## II.    UNDISPUTED FACTS

On October 24, 2000, AHN, as tenant, and The Pointe at Eagle Highlands, L.L.C. ("The Pointe"), as landlord, entered into a Full Service Lease (the "Lease"). (Compl., Ex. A.[1])  By the Lease, AHN rented office space that became Suite 110 (the "Leased Premises") in a new building to be constructed in the Eagle Highlands office development in Marion County, Indiana, which became 6855 Shore Terrace Drive, Indianapolis, Indiana 46254 (the "Building").  (Compl., Ex. A.)

Section 11.02 of the Lease provided:

> Notwithstanding any provision above, [AHN] shall have an absolute right during any term, option, period, extension or renewal of this Office Lease to assign or sublease to all or any subset of the following persons *whether it be to them as individuals or in any business association*:  Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D. and any future American Health Network Eagle Highland Physicians (all hereinafter referred to as "Eagle Highlands Physicians") from Landlord.  And further notwithstanding any provisions above, Landlord agrees that the assignment or sublease to Eagle Highlands Physicians will result in Landlord immediately releasing Tenant from all liability under this Office Lease.

(Compl., Ex. A § 11.02 (emphasis added).)

MFP claims that an LLC like LALR is not a "business association" within the meaning of Section 11.02.  On that key question, MFP is simply wrong.

---

[1] The original Complaint, filed April 4, 2007, includes the Lease and sixteen (16) other exhibits.  The Amended Complaint, the operative Complaint now, filed on or about April 10, 2007, did not re-attach those same exhibits, which were not changed by the amendment.

After construction of the Building was completed in early 2002, AHN and The Pointe entered into the Amendment to Lease dated June 1, 2002, which, among other things, confirmed that the Leased Premises constituted 15,458 square feet of the Building. (Compl., Ex. A.) A few years later, The Pointe got into financial trouble, in part because most of the Building remained unleased, which led The Huntington National Bank ("HNB"), which had financed The Pointe's construction of the Building, to take the Building (and the real estate) by a deed in lieu of foreclosure and then transfer it to its affiliated corporation, Forty-One Corporation ("Forty-One"). (Def.s' Designation of Evidence in Support of their Mot. for Summ. J. ("Designation"), Ex. 1, Dep. of Douglas A. Pluss, a principal of MFP, taken April 29, 2008 ("Pluss Dep.") at 233-34.)

Effective August 20, 2004, Forty-One agreed to sell the Building to SMF Property Acquisitions, Inc. ("SMF") by a Purchase and Sale Contract ("Sale Contract." (Designation Ex. 2.) On November 19, 2004, SMF assigned to ASM Polo Run, LLC ("ASM"), DSF Polo Run, LLC ("DSF") and PS Polo Run, LLC ("PS") its rights and obligations under the terms of the Sale Contract with Forty-One. (Designation Ex. 3.)

On November 22, 2004, ASM, DSF and PS bought the Building from Forty-One for $3,400,000 with the proceeds of a $4,400,000 loan from HNB (Designation Ex. 1, Pluss Dep. at 256), a transaction documented by twenty-six separate documents included in a Closing Book of that date compiled by the Denver lawyers for ASM, DSF and PS, LottnerRubinFishmanBrown+Saul, P.C. ("LRFB&S"). A

copy of that Closing Book was Deposition Exhibit 72 at the Pluss deposition (Designation Ex. 1, Pluss Dep. at 171-72), and the Index to the Closing Book is attached to the Designation as Exhibit 4 (Designation Exs. 1, 4.)

As part of the November 22, 2004 sale, Forty-One assigned the Lease and its interests therein to ASM, DSF and PS. (Designation Ex. 5.) ASM has one member, Andrew Miller ("Miller"). DSF has one member, David S. Frishman ("Frishman"). PS, later renamed Joint Pluss Eagle Highlands, LLC ("Joint Pluss"), has two members, Douglas A. Pluss ("Pluss") and Pluss Investment Company, LLC. (Designation Ex. 1, Pluss Dep. at 127.) Effective May 2, 2005, ASM, DSF and PS contributed their respective interests in the Building to MFP. (Designation Ex. 6, Interog. No. 8.) The members of MFP are ASM, DSF and Joint Pluss. (Am. Compl. ¶ 1.)

The three principals of MFP, Pluss, Miller and Frishman, are sophisticated, educated and experienced investors. For example, an e-mail to HNB's lawyer Howard R. Cohen ("Cohen") dated September 9, 2004, apparently a part of HNB's due diligence in investigating the parties to whom it was being asked to loan $4.4 million to buy the Building, includes an e-mail from Frishman's assistant forwarding to HNB biographies of the three men and some of their companies that demonstrate their education and acumen. (Designation Ex. 7, Aff. of Howard R. Cohen and attachments thereto.)

As another example, Doug Pluss practiced law as a transactions and tax attorney for 21 years before deciding to become his own boss as an "entrepreneur" in

"real estate investment, some oil and gas and some private equity investment." (Designation Ex. 1, Pluss Dep. at 13, ll. 17-24; 14-16.)  Pluss is a member of 20-25 LLCs himself, directly or indirectly, and has been investing in limited liability companies for 15-20 years.  (Designation Ex. 1, Pluss Dep. at 248.)

How the principals of MFP have handled the transaction at issue is further evidence of their sophistication.  For example, while they purchased the Building for $3.4 million, and borrowed $4.4 million, they have only "paid out of pocket thirty or forty thousand dollars" in interest on that loan because "all the rest of the interest payments have been covered by the excess of the loan above the purchase price . . . ." (Designation Ex. 1, Pluss Dep. at 257, 258, ll. 2-9.)  Further, the loan will not mature for another year, and, in the meantime, they will not have to make any other interest payments because those interest payments will come out of the $900,000 which is still left from the loan to cover interest payments.  (*Id.* at 258, ll. 10-24.)  Meanwhile, those three principals of MFP have been "deducting management fees, real estate property taxes . . . interest . . . [and taking] some depreciation, legal fees [and] utility expenses . . . ."  (Designation Ex. 1, Pluss Dep. at 242, ll. 7-22.)  Moreover, if the three principals sell the Building and put any gain into similar realty within 180 days, "then we'll defer the gain" and they could ultimately keep deferring the gain until they die.  (Designation Ex. 1, Pluss Dep. at 243, ll. 17-24.)

Such background of the principals of MFP is relevant to a number of MFP's claims and Defendants' defenses thereto, as described below.

As another part of the transaction by which ASM, DSF and PS bought the Building on November 24, 2004, Ben Park ("Park"), as President and Chief Executive Officer of AHN, executed a Tenant Estoppel Letter, as a condition precedent to HNB's loan to ASM, DSF and PS. (Designation Ex. 8.) The Tenant Estoppel Letter, addressed both to HNB and to ASM, DSF and PS, includes this statement:

> . . . The Lease has not been assigned or sublet or been the subject of any lien or encumbrance; *however, we wish to advise you that, pursuant to Section 11.02 of the Lease, Tenant has the absolute right to assign its interest in the Lease or to sublease the Leased Premises to Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D., or either of them, or other Eagle Highland Physicians of Tenant, or any business association they form, upon which event Tenant shall be relieved of all liability under the Lease.*

(Designation Ex. 8, ¶ 2 (emphasis added).)

Paragraph 2 of the Tenant Estoppel Letter thus reinforces Section 11.02 of the Lease: AHN had the right to assign the Lease to a business association comprised of Reitz and Adams.

When Kristie Hill ("Hill"), counsel for AHN, first received a draft of the Tenant Estoppel Letter from Cohen, counsel for Forty-One and HNB, the letter did not contain the assignment language highlighted above. (Designation Ex. 9, Dep. of Kristie Hill ("Hill Dep.") at 46-47, 55-56, 96-99; Designation Ex. 10, ¶ 2.) It was Hill who in her redlined version inserted the paragraph advising HNB, Forty-One and MFP's predecessors ASM, DSF and PS of AHN's absolute right to assign the Lease to Reitz and Adams "**or** either of them . . . **or** any business association they form . . .

." (Designation Ex. 9, Hill Dep. at 55-56, 96-99; Designation Ex. 10 (emphasis added).)

Cohen, by e-mail, forwarded the Tenant Estoppel Letter to Leslie Caruso ("Caruso"), vice president of HNB, and to Alan Lottner and Scott Ross of LSRF&S, counsel for ASM, DSF, PS, Miller, Frishman and Pluss. (Designation Ex. 11; Designation Ex. 1, Pluss Dep. at 63-64, 153.) Frishman, in turn, forwarded the Tenant Estoppel Letter to Miller and Pluss. (Designation Ex. 1, Pluss Dep. at 151-54; Designation Ex. 11. [2]) Thus, all three of the principals of MFP and two of their lawyers at LSRF&S had the Tenant Estoppel Letter confirming AHN's right to assign the Lease to a business association such as LALR *before* they bought the Building and assumed the Lease. (Designation Ex. 1, Pluss Dep. at 234-35.)

Moreover, the principals of MFP had such information long before they bought the Building from Forty-One with the money they borrowed from HNB on November 22, 2004. As a realtor trying to sell the Building for Forty-One, CB Richard Ellis ("CBRE") prepared an "Investment Offering Memorandum" (the "Offering Memorandum"). (Designation Ex. 12; Designation Ex. 1, Pluss Dep. at 120-21.) The Offering Memorandum included the following:

> . . . Tenant [AHN] has an absolute right during any term option period, extension or renewal of this Office Lease to assign or sublease to all or any subset of the following persons *whether it be to them as individuals or in any business association*: Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D. and any future American

---

[2] Deposition Exhibit 64, referred to in Pluss' deposition testimony, is a copy of the final Tenant Estoppel Letter before it was executed. Exhibit 65, referred to in Pluss' deposition testimony, is the same Tenant Estoppel Letter that is referred to in Deposition Exhibit 35. (Designation Ex. 1, Pluss Dep. at 234-35.)

> Health Network Eagle Highland Physicians.  In addition,
> further notwithstanding any previous provisions,
> Landlord agrees that the assignment or sublease to Eagle
> Highlands Physicians will result in limited liability
> immediately releasing Tenant from all liability under the
> Office Lease.

(Designation Ex. 12 (emphasis added).)  Obviously, the language quoted above from the Offering Memorandum tracks Section 11.02 of the Lease and previews the language in the Tenant Estoppel Letter.  Pluss testified that he both received and read CBRE's Offering Memorandum before ASM, DSF and PS purchased the Building and assumed The Pointe's rights and obligations under the Lease. (Designation Ex. 1, Pluss Dep. at 120-21.)

On March 3, 2006, Reitz and Adams formed LALR, a limited liability company or LLC.  (Designation Ex. 13, Dep. of Lawrence A. Reitz, M.D. ("Reitz Dep.") at 137-38; Designation Ex. 14, Dep. of Laurence M. Adams, M.D. ("Adams Dep.") at 140-41; Designation Ex. 16, Affidavit of Kent M. Broach, Esq. ("Broach Aff.") ¶¶ 3-5 and Exs. A and B, attached thereto.)  On March 3, 2006, pursuant to Section 11.02 of the Lease, AHN assigned the Lease to LALR (the "Assignment"). (Designation Ex. 15; Designation Ex. 13, Reitz Dep. at 138; Designation Ex. 14, Adams Dep. at 139.)  On that same date, LALR subleased the Leased Premises to AHN (the "Sublease").  (Compl., Ex. H; Designation Ex. 13, Reitz Dep. at 140; Designation Ex. 14, Adams Dep. at 139.)

Reitz and Adams capitalized LALR both with the Sublease and with a cash contribution of $12,500 each for a total cash contribution of $25,000.  (Designation Ex. 17, Aff. of Lawrence A. Reitz, M.D. ("Reitz Aff.") ¶ 5; Designation Ex. 18, Aff. of

Laurence M. Adams, M.D. ("Adams Aff.") ¶ 5; Designation Ex. 13, Reitz Dep. at 137-38, 140; Designation Ex. 14, Adams Dep. at 139-41.)  Reitz made his cash contribution in late April 2006 and Adams made his in early May 2006. (Designation Exs. 19, 20.)  After the Assignment and the Sublease, AHN physicians, including Adams, continued to work in the Leased Premises.  (Designation Ex. 18, Adams Aff. ¶ 11.)  AHN, as LALR's sublessee of the Leased Premises, continued to make monthly rental payments to MFP and MFP accepted those monthly rental payments.  (Designation Ex. 21, Dep. of Hardy Sikand ("Sikand Dep.") at 86.)

At the time AHN assigned the Lease to LALR, LALR's members Reitz and Adams knew that LALR would sublease the space to AHN.  (Designation Ex. 17, Reitz Aff. ¶ 7; Designation Ex. 18, Adams Aff. ¶ 7.)  LALR's operation required no employees and LALR anticipated no ongoing costs.  (Designation Ex. 17, Reitz Aff. ¶ 8; Designation Ex. 18, Adams Aff. ¶ 9.)  LALR merely needed to find alternate tenants should AHN opt to terminate the Sublease with LALR in accordance with its terms but before the end of the term of the Lease.  (Designation Ex. 17, Reitz Aff. ¶ 9; Designation Ex. 18, Adams Aff. ¶ 10.)  When AHN assigned the Lease to LALR, neither MFP nor its members, ASM, DSF and Joint Pluss were creditors of Reitz, Adams or LALR.  (Designation Ex. 17, Reitz Aff. ¶ 10; Designation Ex. 18, Adams Aff. ¶ 11.)

Effective March 3, 2007, AHN terminated the Sublease and vacated the Leased Premises.  (Designation Ex. 21, Sikand Dep. at 86.)  Despite its best efforts, which included a Commercial Sublease Listing Agreement with the Colliers Turley

Martin Tucker Company on August 16, 2006, LALR was unable to locate a new sub-tenant for the Leased Premises. (Designation Ex. 22; Designation Ex. 13, Reitz Dep. at 143-44; Designation Ex. 14, Adams Dep. at 141-45.) After AHN vacated the Leased Premises and LALR was unsuccessful in locating a new subtenant, LALR was unable to pay rent. (Designation Ex. 17, Reitz Aff. ¶ 11; Designation Ex. 18, Adams Aff. ¶ 12.) Thereafter, MFP declared a default under the Lease. (Designation Ex. 1, Pluss Dep. at 261.)

LALR has always filed and maintained the records required for a limited liability company. For example, on March 3, 2006, LALR filed its Articles of Organization with the Indiana Secretary of State ("Secretary"). (Designation Ex. 16, Broach Aff. ¶ 4 and Ex. A, attached thereto.) On that same date, the Secretary issued to LALR a Certificate of Organization, certifying that LALR presented to it Articles of Organization along with the proper fee and that LALR's documentation conformed to the Indiana Business Flexibility Act. (Designation Ex. 16, Broach Aff. ¶ 5 and Ex. B, attached thereto.)

Effective March 3, 2006, Reitz and Adams, as managers and members of LALR, executed a limited liability company operating agreement for LALR. (Designation Ex. 17, Reitz Aff. ¶ 4 and Ex. A, attached thereto; Designation Ex. 18, Adams Aff. ¶ 4 and Ex. A, attached thereto.) Additionally, on April 9, 2008, LALR filed the biennial report required of limited liability companies under Indiana Code § 23-18-12-11. (Designation Ex. 23, Affidavit of Amy L. VonDielingen, Esq. ("VonDielingen Aff.") ¶ 3 and Ex. A, attached thereto.)

Neither Reitz nor Adams ever has made fraudulent representations about LALR. (Designation Ex. 17, Reitz Aff. ¶ 12; Designation Ex. 18, Adams Aff. ¶ 13.) Pluss and his partners had no communication at all with Reitz or Adams. (Designation Ex. 1, Pluss Dep. at 237-38.) LALR has paid from its assets no individual obligations of its members or of anyone else. (Designation Ex. 17, Reitz Aff. ¶ 13; Designation Ex. 18, Adams Aff. ¶ 14.) Similarly, LALR never has comingled its assets and affairs with those of its members or those of anyone else. (Designation Ex. 17, Reitz Aff. ¶ 14; Designation Ex. 18, Adams Aff. ¶ 15.) And, Reitz and Adams, as LALR's members and managers, always have respected LALR as a separate and distinct entity. (Designation Ex. 17, Reitz Aff. ¶ 15; Designation Ex. 18, Adams Aff. ¶ 16.)

LALR always has observed the formalities required for a limited liability company. (Designation Ex. 17, Reitz Aff. ¶ 16; Designation Ex. 18, Adams Aff. ¶ 17.) In fact, as stated above, LALR filed its required biennial report on April 9, 2008. (Designation Ex. 23, VonDielingen Aff. ¶ 3 and Ex. A, attached thereto.) Neither Reitz nor Adams ever has ignored, controlled or manipulated LALR's form. (Designation Ex. 17, Reitz Aff. ¶ 17; Designation Ex. 18, Adams Aff. ¶ 18.)

In its Amended Complaint, MFP has asserted against LALR, Reitz and Adams a claim under the Indiana Crime Victims Relief Act (sometimes, the "ICVR Act"), claims of tortious interference and constructive fraud, and a claim urging the Court to pierce LALR's corporate structure and hold Reitz and Adams personally liable under the Lease.

However, all of MFP's claims follow from MFP's contention that LALR, because it is an LLC, is not a "business association" within the meaning of Section 11.02 of the Lease, the Tenant Estoppel Letter and the Offering Memorandum. Because, as shown below, a limited liability company or LLC like LALR *is* a business association, all of MFP's claims fail.

III.   **STANDARD OF REVIEW**

Construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Trinity Homes, LLC v. Ohio Cas. Ins. Co.*, 2007 U.S. Dist. LEXIS 24370, at *26 (S.D. Ind. March 30, 2007). The purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986)). A court grants summary judgment if it finds that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Peirick v. Ind. Univ.-Purdue Univ. Indpls Athletic Dep't*, 510 F.3d 681, 687 (7th Cir. 2007) (citing Fed. R. Civ. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (further citation omitted)).

IV.   **ARGUMENT**

A.   **Summary of Argument**

MFP's claims against Defendants are without merit. The Lease itself permitted AHN to assign its interest to a business association such as LALR. Therefore, the Lease precludes MFP's claim under the ICVR Act (Count IV of the

12

Amended Complaint) and its tortious interference (Count VI) and constructive fraud (Count VII) claims.

MFP's claim against Defendants under the ICVR Act and its constructive fraud and tortious interference claims also fail for other reasons. MFP contends that Defendants defrauded their creditor, but MFP was not a creditor of Reitz, Adams or LALR when AHN assigned the Lease to LALR. This fact alone dooms MFP's claim under the IVCR Act. Furthermore, no special relationship ever existed between MFP and Defendants, and the absence of such a relationship precludes MFP's constructive fraud claim. MFP's tortious interference claim similarly cannot survive because MFP is unable to satisfy the requisite elements for such a claim.

Finally, MFP's attempt to pierce LALR's corporate structure (Count V of the Amended Complaint) cannot succeed. First, the Lease authorized AHN's assignment of it to LALR and thus LALR's assumption of the Lease. Given that the Lease unambiguously authorizes the very conduct MFP targets, MFP's attempt to pierce the corporate veil is doomed. Alternatively, were the Court to find that the Assignment and assumption of the Lease were somehow improper, then the Lease remains with AHN as a matter of law, eliminating any need for the Court to consider the propriety of piercing LALR's veil. In any event, application of the facts to the relevant tests undermines MFP's effort to target Reitz and Adams' personal finances. Defendants are entitled to summary judgment.

### B.    Indiana Contract Law Precludes MFP's Claim Under The Act And Its Tortious Interference And Constructive Fraud Claims

#### 1.    Indiana Contract Law Governs This Dispute

Indiana law controls whether the Lease authorized AHN's Assignment of the Lease to LALR. Section 16.03 of the Lease, itself, provides that "[t]his Lease shall be governed by and construed pursuant to the law of the State of Indiana." Under Indiana contract law, "interpretation of an unambiguous contract is a matter of law that can be resolved on summary judgment." *Automation by Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006) (citing *Orthodontic Affiliates, P.C. v. Long*, 841 N.E.2d 219, 222 (Ind. Ct. App. 2006)). Contract language is to be given its "plain and ordinary meaning" where, as here, the language is clear and unambiguous. *Aubrey v. United States*, 959 F. Supp. 1019, 1022 (S.D. Ind. 1997) (citing *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985)).

The fact that parties disagree on the proper construction of a contract does not in itself constitute an ambiguity. *Am. Nat'l Fire Ins. Co. v. Rose Acre Farms, Inc.*, 107 F.3d 451, 457 (7th Cir. 1997) (citation omitted). "Rather, ambiguity arises where the policy 'is susceptible to more than one interpretation and reasonable persons would honestly differ as to its meaning.'" *Id.* (quoting *Gen. Cas. of Wis. v. Diversified Painting Serv., Inc.*, 603 N.E.2d 1389, 1390 (Ind. Ct. App. 1992)). Under Indiana law, when an ambiguity is patent – that is, when it arises from within the document itself and cannot be resolved by reference to the document – the Court may not consider extrinsic evidence to resolve the ambiguity. *Am. Nat'l Fire*, 107 F.3d at 457 (citations omitted).

### 2. The Unambiguous Language Of The Lease Authorizes AHN's Assignment To LALR

Examination of the Lease in the present case demonstrates that it is unambiguous. Therefore, no extrinsic evidence is admissible for purposes of determining whether § 11.02 endorsed AHN's assignment of the Lease to LALR. Even if the Court were to find an ambiguity, the ambiguity only could be patent – that is, one arising from within the document itself – meaning that extrinsic evidence still would be inadmissible.

Section 11.02 provides:

> *Section 11.02. Assignment to Eagle Highlands Physicians.* Notwithstanding any provision above, *Tenant shall have an absolute right* during any term, option period, extension or renewal of the Office Lease *to assign* or sublease *to all or any subset of the following persons whether it be to them as individuals or in any business association: Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D.* and any future American Health Network Eagle Highland Physicians (all hereinafter referred to as "Eagle Highlands Physicians") from Landlord. And further notwithstanding any provisions above, Landlord agrees that the assignment or sublease to Eagle Highlands Physicians will result in Landlord immediately releasing Tenant from all liability under this Office Lease.

(Compl., Ex. A, § 11.02 (emphasis added).)

The quoted language demonstrates that the contracting parties authorized the conduct MFP challenges in its Amended Complaint. In accordance with § 11.02, on March 3, 2006, AHN assigned its interest in the Leased Premises to LALR, a business association formed by Reitz and Adams. (Designation Ex. 15.)

15

Because § 11.02 gave AHN the absolute right to assign its interest in the Lease to a business association formed by Reitz and Adams, MFP has no tortious interference or constructive fraud claim and no claim under the ICVR Act.

> **3.    The Phrase "Business Association" In § 11.02 Includes A Limited Liability Company**

Discovery to date reveals that MFP will contend that a limited liability company or LLC, such as LALR, AHN and MFP itself, is not a "business association" within the meaning of Section 11.02 of the Lease (and the Tenant Estoppel Letter and the Offering Memorandum).  MFP is wrong.

Numerous Indiana statutes demonstrate that our General Assembly has decided that the "plain and ordinary meaning," *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d at 470, of the words "business association" includes an LLC like LALR.  For example, the most pertinent Indiana statute, the Indiana Business Flexibility Act, Indiana Code § 23-18-1-1 *et seq.*, defines a limited liability company as "an entity that is an unincorporated *association* organized under this article."  Ind. Code § 23-18-1-11 (emphasis added).

Similarly, Article 15 of Title 25 of the Indiana Code, which regulates Embalmers and Funeral Directors, defines a "person" as "a partnership, **limited liability company** . . . or other *business association*."  Ind. Code § 25-15-2-21 (emphasis added).  Such definition shows that the Indiana General Assembly perceives a limited liability company to be a "business association."

Likewise, Indiana Code § 32-9-1-3(c), part of the now-repealed Indiana version of the Uniform Disposition of Unclaimed Property Act in Indiana Code § 32-

9-1-1, *et seq.* defined "business association" as "a corporation, *limited liability company* . . . or other association for business purposes of two (2) or more individuals, whether or not for profit." The replacement to Indiana's version of the Uniform Disposition of Unclaimed Property Act, the Indiana Unclaimed Property Act, Indiana Code § 32-34-1, *et seq.*, likewise shows that our General Assembly understands that a limited liability company is a business association. Specifically, the new Act defines "business association" to include, *inter alia*, "[a] limited liability company." Ind. Code § 32-34-1-5(2).

Such statutes of our General Assembly are not the only evidence that the "plain and ordinary meaning" of "business association" is broad enough to include a limited liability company like LALR.

For example, in Colorado, which is home to MFP and its members (Am. Compl. ¶ 1), the Legislature defines business association to include limited liability companies. *See, e.g.,* Col. Rev. Stat. § 24-54.8-102 (defining "company" as an "entity that has publicly traded securities and is an organization . . . limited liability company, or *other . . . business association* . . . .). Thus, the Colorado Legislature, like the Indiana General Assembly, understands that a limited liability company is a business association within the plain and ordinary meaning of those words.

At least two reported cases, one from the highest court in MFP's home state of Colorado, have held that a limited liability company is a business association. In *Colorado Civil Rights Commission v. Regents of the University of Colorado*, 759 P.2d 726 (Colo. 1988), the Colorado Supreme Court found that the Colorado General

Assembly defines " 'person' to include one or more individuals, corporate and *other* forms of *business associations* . . . ." *Id.* at 731 (emphasis added).  Instructive also is *Friedman v. Superior Court of California*, 2006 Cal. App. LEXIS 7588, at \*\*19-20 (2006) (unpublished), in which the California Court of Appeals wrote that "[e]xternally, the law recognizes . . . limited liability companies as forms of business associations."

Many jurisdictions expressly include a limited liability company in their definition of a "business association" for purposes of their respective statutes regarding unclaimed property.  *See*, *e.g.*, Code of Ala. § 25-12-71(2) (Alabama); Alaska Stat. § 34.45.760(3) (Alaska); A.R.S. § 44-301(2) (Arizona); A.C.A. § 18-28-201(3) (Arkansas); D.C. Code § 41-102(4) (District of Columbia); Idaho Code § 14-501(5) (Idaho); 765 ILCS 1025/1(b) (Illinois); Iowa Code § 556.1 (Iowa); K.S.A. § 58-3934(c) (Kansas); La. R.S. 9:153(3) (Louisiana); 33 M.R.S. § 1952(3) (Maine); Mont. Code Anno. § 70-9-802(3) (Montana); R.R.S. Neb. § 69-1301(b) ( Nebraska); Nev. Rev. Stat. Ann. § 120A.040 (Nevada); N.J. Stat. § 46:30B-6(d) (New Jersey); N.M. Stat. Ann. § 7-8A-1(3) (New Mexico); N.C. Gen. Stat. § 116B-52(2) (North Carolina); N.D. Cent. Code § 47-30.1-01(4) (North Dakota); 27 V.S.A. § 1241(3) (Vermont); Va. Code Ann. § 55-210.2 (Virginia); W. Va. Code § 36-8-1(3) (West Virginia); Wis. Stat. § 177.01(5) (Wisconsin).

Numerous secondary legal authorities identify an LLC as a form of business association.  *See, e.g.*, Howard M. Friedman, *The Silent LLC Revolution: The Social Cost of Academic Neglect,* 38 Creighton L. Rev. 35, 67 (2004) ("Over the past two

decades, new business associations (such as limited liability companies, limited liability partnerships, and variations of the business trust) have been developed and have gained widespread acceptance in the business world."); 8 Stan. J.L. Bus. & Fin. 289 (2003) ("Although…Limited Liability Companies (LLCs) are fairly novel tools for structuring business associations, they have been met with overwhelming acceptance as the instruments of choice in the business community."); Kimberley C. Latham, *Cheeseheads and Longhorns: Why Texas Should Follow Wisconsin's Lead in the Treatment of Limited Liability Company Member Interests as Securities,* 9 Tex. Wesleyan L. Rev. 59, 59 (2002) ("The limited liability company has become one of the more attractive business associations"); Marybeth Bosko, *The Best of Both Worlds: The Limited Liability Company,* 54 Ohio St. L.J. 175, 175 (1993) ("In the past few years, state legislatures have shown a renewed interest in what is perhaps the most innovative form of business association, the limited liability company (LLC)"); Ernest A. Seemann, *The Florida Limited Liability Company: A New Form of Business Association,* 57 FLA. B.J. 536 (1983); *see also* Dep. Ex. 92, excerpt from the Abridged Seventh Edition of Black's Law Dictionary at 157, which defines "business associations" by reference to "business enterprises," the definition of which includes "limited liability companies."  (Designation Exs. 1, 24.)

Similarly, the Internal Revenue Service's ("IRS") definition of a limited liability company makes it clear that it is a form of a business association. Specifically, the IRS writes that "a Limited Liability Company ("LLC") is a relatively new business structure allowed by state statute.  LLCs are popular

because, similar to a corporation, owners have limited personal liability for the debts and actions of the LLC.  Other features of the LLCs are more like a partnership, providing management flexibility and benefit of pass-through taxation. Owners of an LLC are called members.  Since most states do not restrict ownership, members may include individuals, corporations, other LLCs and foreign entities . . . ."  *See* www.IRS.gov/businesses/small/article.

LLCs also are recognized as a form of business association in academia. Consequently, LLCs are commonly incorporated into law school corporations and business associations courses.  *See, e.g.,* Thomas R. Hurst, *Fundamental Themes in Business Law Education: Teaching Limited Liability Companies in the Basic Business Associations Course,* 34 Ga. L. Rev. 773 (2000).  For example:

> At the University of Texas Law School, "Business Associations" [is a] basic introductory course, a four-hour, one-semester course that begins with general partnerships, limited partnerships, and other unincorporated business forms, and then proceeds through limited liability companies. . . .  In other schools, this basic course may have a different name; it may be called "Business Organizations," "Business Entities," "Business Law," or a similar name.

Robert W. Hamilton, 37 Suffolk U. L. Rev. 859, 862 n.3 (2004).

As another example, the textbook used at Indiana University School of Law – Bloomington in the Spring 2007 "Corporations" course includes LLCs as a form of business association, stating that "most *business associations* are organized as either a partnership, corporation, or *limited liability company. . . .*"  O'Kelly & Thompson, *Corporations and Other Business Associations* 2 (5th ed. 2006) (emphasis added).

20

The "plain and ordinary meaning" of the words "business association," as found in commonly used dictionaries, confirms that the meaning of those words is broad enough to include an LLC, as stated by state legislatures in Indiana, Colorado and numerous other states, by the Courts in at least two reported cases, and by the numerous secondary authorities cited above. For example, the Merriam-Webster online dictionary provides as the first definition for "association" "1 a: The act of associating, b: the state of being associated : combination, relationship . . . ." *See* www.merriam-webster.com/dictionary/associations. "Combination" is defined first as "1 a: a result or product of combining, *especially* : an alliance of individuals, *corporations*, or states united to achieve a social, political, or economic end . . . ." *See* www.merriam-webster.com/dictionary/combination (emphasis added). "Business" is defined as "3 a: a usually commercial or mercantile activity engaged in as a means of livelihood . . . b: a commercial or sometimes an industrial enterprise . . . c: dealings or transactions especially of an economic nature . . . ." *See* www.merriam-webster.com/dictionary/business. Nothing in any of these common sense dictionary definitions suggests or even implies that a limited liability company is not simply another form of business association, i.e., a combination of individuals for economic activity, just like a corporation, limited liability partnership or the myriad other forms of business structures (to use the IRS' term) that exist.

Nothing in these common sense dictionary definitions, or in the many statutes, cases and secondary authorities discussed and cited above, suggests that a limited liability company is not a "business association" within the meaning of

Section 11.02 of the Lease or, conversely, that "business association," as that phrase is used in Section 11.02 of the Lease, the Tenant Estoppel Letter and the Offering Memorandum, somehow does not include limited liability entities such as limited liability companies like LALR that were formed under the Indiana Flexibility in Business Act. The "plain and ordinary meaning" of "business association" is plainly broad enough to include a limited liability company like LALR.

### 4.    MFP Has Waived Any Right It Otherwise May Have Had To Object To Defendants' Interpretation Of § 11.02

Waiver is an intentional relinquishment of a known right and requires both knowledge of the existence of the right and intention to relinquish it. *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000) (citing *Matter of S.L.*, 599 N.E.2d 227, 229 (Ind. Ct. App. 1992)). "[W]aiver may be shown either by express or implied consent, and, thus the right may be lost by a course of conduct which estops its assertion." *Id.* (citing *Continental Optical Co. v. Reed*, 86 N.E.2d 306, 309 (1949)).

As explained, *supra*, in the Undisputed Facts section, all three of the sophisticated and savvy principals of MFP, and two of their lawyers at LRFB&S, had in hand the language that is in Section 11.02 of the Lease, the Tenant Estoppel Letter and the Offering Memorandum, which clearly gave AHN the right to assign the Lease to a business association like LALR, before or at least as of the time they bought the Building from Forty-One and assumed The Pointe's position under the Lease on November 22, 2004.

Pluss, the lawyer who had practiced transactional tax law and other commercial matters for 21 years before beginning his career as an entrepreneur three years before this transaction in 2004, admitted in his deposition that he actually read the Tenant Estoppel Letter.  (Designation Ex. 1, Pluss Dep. at 153-54.)  Pluss also admitted that he read the Offering Memorandum, which contained language identical to Section 11.02 of the Lease.  (Designation Ex. 1, Pluss Dep. at 120-21.)  ASM, DSF and PS nonetheless bought the Building, even though they knew AHN retained an absolute right to assign the Lease to a business association, which, as shown above, includes an LLC like LALR.  They cannot now be heard to complain about what they knowingly did.

Under such circumstances, there can be no genuine issue of fact that MFP waived any right it otherwise may have had to object to AHN's Assignment of the Lease to LALR under § 11.02 of the Lease.

### C.    MFP Cannot Satisfy The Elements For Its Claim Under The Indiana Crime Victims Relief Act

MFP's claim under the ICVR Act, Indiana Code § 34-24-3-1, also fails for a reason unrelated to § 11.02.  Although MFP relies on Indiana Code § 35-43-5-4(8) for its claim under that Act, MFP simply cannot prove the elements of such claim.

Under Indiana Code § 35-43-5-4(8), a person who "with intent to defraud the person's creditor or purchaser, conceals, encumbers, or transfers property . . . commits fraud, a Class D felony."  Ind. Code § 35-43-5-4(8).  By the plain language of § 35-43-5-4(8), a plaintiff may not maintain a claim thereunder unless the defendant was the plaintiff's creditor at the time of the alleged purchase,

concealment, encumbrance or transfer of property.  When AHN assigned the Lease to LALR, Reitz, Adams and LALR owed MFP nothing.  MFP was not Reitz, Adams or LALR's creditor.  (Designation Ex. 17, Reitz Aff. ¶¶ 10, 18; Designation Ex. 18, Adams Aff. ¶¶ 11, 19.)  Thus, Defendants cannot constitute "persons with intent to defraud their creditors" for purposes of Indiana Code § 35-43-5-4(8).

For this reason alone, in addition to § 11.02 of the Lease, Defendants are entitled to summary judgment that MFP take nothing against them by its claim under the ICVR Act.

### D.   MFP Cannot Prevail On Its Constructive Fraud Claim

Even if MFP's constructive fraud claim were to survive the plain and ordinary meaning of business association in Section 11.02 of the Lease that includes an LLC, other defects in such claim are fatal.  Specifically, MFP cannot establish the relationship required for it to maintain a constructive fraud claim against Defendants.

In *Sees v. Bank One, Indiana*, 839 N.E.2d 154 (Ind. 2005), the Indiana Supreme Court held that constructive fraud

> . . . is based on the premise that there are "[s]ituations which might not amount to actual fraud, but which are so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent." *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 324 (Ind. Ct. App. 1991).  A claim of constructive fraud requires, at a minimum, the existence of a duty on the part of the party to be charged arising out of the parties' relationship.  *Strong v. Jackson*, 777 N.E.2d 1141, 1147 (Ind. Ct. App. 2002), trans. denied.  Such a duty exists in fiduciary relationships and in relationships of trust and confidence.  *Id.* at 1146-47.

*Sees*, 839 N.E.2d at 164 n.8.

24

Applying this case law to the present facts dooms MFP's constructive fraud claim against Defendants.  At the time AHN assigned the Lease to LALR, MFP was nothing more than AHN's landlord.  (Designation Ex. 17, Reitz Aff. ¶ 10; Designation Ex. 18, Adams Aff. ¶ 11.)  There existed no relationship of any kind between Defendants and MFP (*see, e.g.,* Designation Ex. 1, Pluss Dep. at 237-38), let alone a fiduciary relationship or a special relationship of trust and confidence. The background and sophistication of the principals of MFP, as described *supra*, belie any notion that they trusted and relied blindly on Reitz and Adams. Accordingly, Defendants deserve summary judgment against such claim of MFP.

    **E.**    <u>Defendants Did Not Tortiously Interfere With The Lease Between MFP And AHN</u>

In order to succeed in a tortious interference claim, a plaintiff must establish (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducement of the breach of contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach.  *Morgan Asset Holding Corp. v. CoBank*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000).  Because MFP as a matter of law cannot satisfy all the elements, Defendants are entitled to summary judgment against this claim.

The first impediment to MFP's tortious interference claim is its inability to prove that AHN breached the Lease.  MFP cannot do so because, as shown above, AHN's act of assigning the Lease to LALR was authorized by § 11.02 itself and

therefore was not a breach of the Lease contract. Because AHN's assignment to LALR did not constitute a breach, MFP's tortious interference claim fails.

Second, there is no evidence that Defendants **induced** AHN to assign the Lease to LALR. The absence of such evidence poses another insurmountable obstacle for MFP, who has the burden of proof.

Third, MFP cannot show an absence of justification, another element of a tortious interference claim. "'To satisfy [the element of lack of justification], the breach must be malicious and exclusively directed to the injury and damage of another.'" *Morgan Asset Holding Corp.*, 736 N.E.2d at 1272 (quoting *Winkler v. V.G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600-01 (Ind. Ct. App. 1993)). AHN's Assignment of the Lease was authorized by § 11.02, which precludes Defendants' acceptance of the assignment from qualifying as "malicious" or "exclusively directed to the injury and damage of another."

For these reasons, MFP's tortious interference claim cannot survive Defendants' summary judgment motion.

### F.    MFP Cannot Pierce LALR's Corporate Veil

According to MFP, if AHN's assignment of the Lease to LALR was valid, then the Court should pierce LALR's corporate veil to hold Reitz and Adams personally liable on the Lease. MFP is wrong.

In *Escobedo v. BHM Health Associates, Inc.*, 818 N.E.2d 930 (Ind. 2004), the Indiana Supreme Court discussed the "severe burden" faced by a party seeking to pierce the corporate veil. *Id.* at 933. According to the Supreme Court, "a party may only recover from a shareholder if the party proves by a preponderance of the

evidence 'that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice.'" *Id.* (quoting *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994) (further citations omitted)).

In determining whether it should pierce a corporate veil, then, a court considers the evidence as to eight factors:  (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; and (8) other shareholder acts or conduct ignoring, controlling or manipulating the corporate form.  *Escobedo*, 818 N.E.2d at 933 (citing *Aronson*, 644 N.E.2d at 867).  As a matter of law, there is no evidence to support a piercing of or a disregard of the limited liability structure of LALR to get into the personal pockets of Reitz and Adams because there is no evidence of any of these eight factors.

### 1.    Undercapitalization

LALR was not undercapitalized in light of is purposes.  Reitz and Adams capitalized LALR with AHN's Sublease of the Leased Premises and with a cash contribution from each of them of $12,500 to LALR for a total cash capitalization of $25,000.  (Designation Ex. 13, Reitz Dep. at 137-38; Designation Ex. 19; Designation Ex. 14, Adams Dep. at 140-41; Designation Ex. 20.)  Reitz and Adams formed LALR to accept AHN's Assignment of the Lease, to sublease the Leased Premises to AHN, and to find new tenants to rent the space should AHN terminate

before the end of the Lease. (Designation Ex. 13, Reitz Dep. at 140, 142.) Reitz and Adams knew at the time of AHN's assignment that LALR simultaneously would be subleasing the premises to AHN. (*Id.*) Therefore, LALR's members knew LALR would incur no expenses in its start-up. Moreover, as assignee of the Lease with a sublease already in place, the operation of LALR would require no employees and, therefore, it anticipated no ongoing costs. (Designation Ex. 17, Reitz Aff. ¶ 8; Designation Ex. 18, Adams Aff. ¶ 9.) LALR merely needed to find alternate tenants should AHN opt to terminate the Sublease, prior to the expiration of the Lease, in accordance with the terms of the Sublease.

In light of LALR's purposes, it was not undercapitalized. It ran into difficulty when neither its members nor its realtor – Colliers Turley Martin Tucker – were able to locate a new tenant or tenants to lease the Leased Premises after AHN terminated the Sublease. (Designation Ex. 13, Reitz Dep. at 142-44.) Such inability, however, does not suggest that Reitz and Adams undercapitalized LALR.

### 2. Absence Of Limited Liability Company Records

The next factor for the Court's consideration is the absence of corporate records. The facts relevant to this element are further proof that MFP may not pierce LALR's corporate veil.

LALR filed and has maintained the records required for a limited liability company. On March 3, 2006, LALR filed its Articles of Organization with the Indiana Secretary of State ("Secretary"). (Designation Ex. 16, Broach Aff. ¶ 4 and Ex. A, attached thereto.) On that same date, the Secretary issued to LALR a Certificate of Organization, certifying that LALR presented to it Articles of

Organization along with the proper fee and that LALR's documentation conformed to the Indiana Business Flexibility Act.  (Designation Ex. 16, Broach Aff. ¶ 5 and Ex. B, attached thereto.)

Effective March 3, 2006, Reitz and Adams, as managers and members of LALR, executed a Limited Liability Company Operating Agreement for LALR.  *See* Ind. Code § 23-18-4-6.  (Designation Ex. 17, Reitz Aff. ¶ 4 and Ex. A, attached thereto; Designation Ex. 18, Adams Aff. ¶ 4 and Ex. A, attached thereto.) Additionally, on April 9, 2008, LALR filed the biennial report required under Indiana Code § 23-18-12-11.  *See* Ind. Code § 23-18-12-11.  (Designation Ex. 23, VonDielingen Aff. ¶ 3 and Ex. A, attached thereto.)  LALR maintains all the records required of a limited liability company.  MFP cannot prevail in any argument that LALR lacks the requisite corporate records.

> **3.** **Fraudulent Representation By Members And Use Of The Limited Liability Company To Promote Fraud, Injustice Or Illegal Activities**

Under *Escobedo*, MFP must also prove that LALR members made fraudulent representations regarding LALR and that they used LALR to promote fraud, injustice or illegality.  This MFP cannot do.

Because the Assignment of the Lease to LALR as a business association of Reitz and Adams was, as shown above, authorized by § 11.02 of the Lease and confirmed to MFP's principals in the Tenant Estoppel Letter and Offering Memorandum, Reitz and Adams have *not* used LALR's limited liability form or structure to promote fraud or injustice.

Further, neither Reitz nor Adams ever has made fraudulent representations
to MFP or anyone else about LALR. (Designation Ex. 17, Reitz Aff. ¶ 12;
Designation Ex. 18, Adams Aff. ¶ 13.) Pluss admitted that he has not had *any*
communications with Reitz, Adams or their counsel Mike Cook, and further
testified that he was not aware of any communications between either of his two
partners (Miller and Frishman), or their two Colorado law firms, with Reitz or
Adams. (Designation Ex. 1, Pluss Dep. at 237-38.)

In March 2006, Reitz and Adams formed LALR, and in late April and early
May 2006, they made their respective capital contributions to it. (Designation Ex.
13, Reitz Dep. at 137-38; Designation Ex. 19; Designation Ex. 14, Adams Dep. at
140-41; Designation Ex. 20.) Later, LALR employed a realtor to locate a subtenant
to occupy the Leased Premises after AHN terminated its sublease. (Designation Ex.
22.) None of this activity possibly could constitute a misrepresentation.

Similarly, LALR itself was not used to promote fraud, injustice or illegal
activities. Again, LALR was formed to accept Assignment of the Lease, as
authorized by § 11.02 of the Lease, and to re-let the Leased Premises if AHN
terminated its Sublease (as it could under the Sublease) before the end of the term
of the Lease. There is nothing fraudulent or illegal about such formation. Indeed,
LALR's Articles of Organization, which were certified by the Secretary of State,
stipulate that LALR's purpose is to "have unlimited power to engage in and do any
lawful act concerning any or all lawful businesses for which limited liability
companies may be organized according to the laws of the State of Indiana, including

30

all powers and purposes now and hereafter permitted by law to a limited liability

company." (Designation Ex. 16, Broach Aff. ¶ 4 and Ex. A, attached thereto.)

One of the purposes of formation permitted by law is to "[p]urchase, receive,

lease or otherwise acquire and own, hold, improve, use, and otherwise deal with real

or personal property, or any legal or equitable interest in property, wherever

located." Ind. Code § 23-18-2-2(3). A limited liability company also is permitted to

"sell, convey, mortgage, pledge, lease, exchange, and otherwise dispose of all or any

part of its property." Ind. Code § 23-18-2-2(4). LALR's activity falls directly into

the foregoing statutorily-endorsed categories.

Section 11.02 of the Lease permitted AHN to assign the Lease to LALR. The

fact that LALR failed in its efforts to locate a tenant to replace AHN does not lead to

MFP's desired conclusion that LALR was used to promote fraud, injustice or illegal

activities. If this were the case, then any failed entity unable to satisfy its

obligations would, without more, be an entity promoting fraud, injustice or

illegality. This is not the law.

MFP cannot satisfy its burden in proving fraudulent representations or use of

LALR to promote fraud, injustice or illegality. MFP's effort to pierce the corporate

veil fails as a matter of law.

> **4.**    **Payment By LALR Of Individual Obligations, Commingling Of Assets And Affairs, Failure To Observe Required Formalities And Other Member Conduct Ignoring The Limited Liability Company Form**

The remaining factors for the Court's review under *Escobedo* are whether

LALR paid individual obligations, whether LALR commingled its assets and affairs,

31

whether LALR failed to observe required corporate formalities, and whether there is other member conduct ignoring, controlling or manipulating the limited liability company form.  Because Reitz and Adams properly have conducted the affairs of LALR, none of these factors assist MFP in its effort to pierce LALR's corporate veil.

LALR has paid from its assets no individual obligations of its members or anyone else.  (Designation Ex. 17, Reitz Aff. ¶ 13; Designation Ex. 18, Adams Aff. ¶ 14.)  Similarly, LALR never has commingled its assets and affairs with those of its members or with those of anyone else.  (Designation Ex. 17, Reitz Aff. ¶ 14; Designation Ex. 18, Adams Aff. ¶ 15.)  Reitz and Adams, as LALR's members and managers, always have respected LALR as a separate and distinct entity. (Designation Ex. 17, Reitz Aff. ¶ 15; Designation Ex. 18, Adams Aff. ¶ 16.)

LALR never has failed to observe the formalities required for a limited liability company.  Ind. Code §§ 23-18-2-4, 23-18-12-11.  (Designation Ex. 17, Reitz Aff. ¶ 16; Designation Ex. 18, Adams Aff. ¶ 17.)  In fact, on April 9, 2008, LALR filed its required biennial report.  *See* Ind. Code § 23-18-12-11.  (Designation Ex. 23, VonDielingen Aff. ¶ 3 and Ex. A, attached thereto.)  Finally, MFP can point to no conduct by Reitz or Adams – because there is none – suggesting that either Reitz or Adams ignored, controlled or manipulated LALR's form.  (Designation Ex. 17, Reitz Aff. ¶ 17; Designation Ex. 18, Adams Aff. ¶ 18.)

As a matter of law, MFP cannot satisfy the "severe burden," *Escobedo*, 818 N.E.2d at 933, it bears to pass the eight separate tests it must to pierce LALR's limited liability company veil.  Indeed, MFP is unable to pass even one of the

relevant tests.  Defendants are therefore entitled to summary judgment against Count V of the Amended Compalint.

V.    **CONCLUSION**

The Lease itself permitted AHN's Assignment and LALR's acceptance of the Lease because an LLC like LALR is a business association within the plain and ordinary meaning of those words as found in Section 11.02 of the Lease, the Tenant Estoppel Letter and the Offering Memorandum.  Therefore, the Assignment cannot support MFP's claim under the ICVR Act or its claims of tortious interference or constructive fraud.

Moreover, MFP's claim under the ICVR Act also fails because LALR was not MFP's creditor when AHN assigned the lease to LALR.  MFP's constructive fraud claim also fails because there was no fiduciary or special relationship between MFP and Defendants.  MFP also cannot sustain its tortious interference claim because it is unable to satisfy the requisite elements for such claim.

Finally, MFP cannot pierce LALR's limited liability veil.  Because AHN properly assigned and LALR properly accepted the Lease in accordance with its own terms, the assignment and acceptance cannot be used to support MFP's claim that is entitled to pierce LALR's veil on some notion that LALR's limited liability form is being used to promote fraud or injustice.  Alternatively, if the Court somehow finds the Assignment of the Lease to be invalid, then the Lease would remain with AHN as a matter of law, and such finding would eliminate any need for the Court even to consider the propriety of piercing LALR's veil.  In any event, MFP cannot satisfy

any, let alone all, of the eight elements necessary to pierce the corporate or limited liability structure of LALR as a matter of law.

Based upon the foregoing, Defendants are entitled to summary judgment against Counts IV, V, VI and VII and all other claims alleged in MFP's Amended Complaint, and all other proper relief.

Respectfully submitted,


/s/ Douglas B. King
Douglas B. King, #5199-49


/s/ Maureen E. Ward
Maureen E. Ward, #17121-49

Attorneys for Defendants LALR Enterprises, LLC, Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D. ("Defendants")

WOODEN & McLAUGHLIN LLP
211 North Pennsylvania Street
One Indiana Square, Suite 1800
Indianapolis, IN 46204-4208
Tel:    (317) 639-6151
Fax:    (317) 639-6444

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 23, 2008, a copy of the foregoing *Defendants' Brief in Support of Motion for Summary Judgment* was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Richard C. Richmond, III
TAFT STETTINIUS & HOLLISTER LLP
rrichmond@taftlaw.com

Michael T. McNally
Eileen P. H. Moore
ICE MILLER
mcnally@icemiller.com
eileen.moore@icemiller.com


/s/ Maureen E. Ward
Maureen E. Ward