UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MFP EAGLE HIGHLANDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:07-cv-0424-DFH-WTL |
| | ) | |
| AMERICAN HEALTH NETWORK | ) | |
| OF INDIANA, LLC, | ) | |
| LALR ENTERPRISES, LLC, | ) | |
| LAWRENCE A. REITZ, M.D., and | ) | |
| LAURENCE M. ADAMS, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT AMERICAN HEALTH NETWORK OF INDIANA, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## I.       INTRODUCTION

This lawsuit is nothing more than Plaintiff's attempt to re-write a lease so as to deprive AHN of a specifically bargained-for assignment provision which gave AHN the absolute right to assign the lease to any business association formed by Dr. Reitz and Dr. Adams.  Plaintiff, who acquired the property four years after this right was negotiated and the lease was executed, knew of this absolute right when it purchased the property.  Despite this knowledge, Plaintiff now seeks this Court's help to undo a valid assignment so that Plaintiff can maximize the profits from one of its principals' many speculative real estate investments.

Because the undisputed facts demonstrate that AHN had the specifically bargained-for right to assign the lease to a business association such as LALR and, as a result, was released of further liability, the Court should grant AHN's Motion for Summary Judgment.

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Spencer v. Liberty Mutual Insurance Corp.*, 381 F. Supp. 2d 811, 813 (S.D. Ind. 2005) *citing* Fed. R. Civ. P. 56(c).

A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *Save the Valley Inc. v. U.S.E.P.A.*, 223 F. Supp. 2d 997, 1002 (S.D. Ind. 2002)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998)).  Where, as here, the primary question revolves around the interpretation of an unambiguous contractual provision, summary judgment is particularly appropriate.  *Automation By Design, Inc. v. Raybestos Products Co.*, 463 F.3d 743, 753 (7th Cir. 2006) *citing Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006) and *Orthodontic Affiliates, P.C. v. Long*, 841 N.E. 2d 219, 222 (Ind. Ct. App. 2006).

## III.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

A.    The Lease.

1.    AHN was founded in 1994 by a group of physicians seeking a better method of delivering quality health care.  AHN's mission is to provide the most complete and highest quality medical care available and to build an organization that has the incentives properly aligned by using a physician compensation model that encourages high quality patient care and expense control.

2.      The physicians in AHN are grouped into care councils.  These care councils are responsible for managing their own expenses and revenue, and determining the manner in which the physicians within the care council are compensated.  (Deposition of Dr. Lawrence Adams, p. 21, ln. 15 – p. 22, ln. 14, attached as Exhibit A.)

3.      Dr. Reitz and Dr. Adams joined AHN in 1998.  At the time, they were practicing in a building owned, at least in part, by Dr. Reitz.  They desired, however, to move to a newer and larger facility so that they could expand their practice.  (Deposition of Hardy Sikand, p. 26, ln. 24 – p. 27, ln. 9, attached as Exhibit B.)

4.      When they approached Hardy Sikand ("Sikand"), who at the time was the Director of Business Development of AHN, Sikand put them in touch with Dan Laser ("Laser"), a developer who had worked with other AHN physicians in the past.  (Ex. B, Sikand Dep., p. 28, ln. 14 – p. 29, ln. 12).

5.      Laser was developing a medical office facility known as The Pointe at Eagle Highlands ("The Pointe") and was looking for both tenants of the facility and investors.  Dr. Reitz and Dr. Adams eventually became both.  (Deposition of Dr. Lawrence Reitz, p. 35, lns. 6-25, attached as Exhibit C.)

6.      On or about October 24, 2000, AHN executed the Full Service Lease (the "Lease") for Dr. Reitz's and Dr. Adams' new space at The Pointe.  At this time, Dr. Reitz and Dr. Adams comprised their own care council.  (Ex. A, Adams Dep., p. 21, ln. 15 – p. 22, ln. 14.) A true and accurate copy of the Lease is attached as Exhibit D.

7.      Pursuant to the policies set forth by AHN's Board of Directors, AHN requires all of its lease agreements to have either a provision permitting AHN to terminate the Lease at any time without penalty or further liability, or a provision that permits AHN to assign a Lease at any

time without penalty or further liability. (Deposition of Dr. Ben Park, p. 29, ln. 21 – p. 30, ln. 2, attached as <u>Exhibit E</u>; Deposition of Kristie Hill, p. 31, lns. 5-17, attached as <u>Exhibit F</u>.)

8.     Thus, the Lease contains the following sections relating to assignments:

> **_Section 11.02_**.   **_Assignment to Eagle Highlands Physicians_**.   Notwithstanding any provision above, Tenant shall have an absolute right during any term, option period, extension or renewal of the Office Lease to assign or sublease to all or any subset of the following persons whether it be to them as individuals or in any business association: Lawrence A. Reitz, M.D. and Lawrence M. Adams, M.D. and any future American Health Network Eagle Highland Physicians (all hereinafter referred to as "Eagle Highlands Physicians") from Landlord.  And further notwithstanding any provisions above, Landlord agrees that the assignment or sublease to Eagle Highlands Physicians will result in Landlord immediately releasing Tenant from all liability under this Office Lease.

(Ex. D, Lease, § 11.02)

9.     The Lease further provided that upon such an assignment, AHN was immediately released from all liability.  (Ex. D, Lease, § 11.02).

B.     <u>MFP's Principals:  Doug Pluss, David Frishman, and Andrew Miller.</u>

10.     MFP is a limited liability company controlled by three sophisticated real estate investors, Doug Pluss ("Pluss"), David Frishman ("Frishman"), and Andrew Miller ("Miller"). (Deposition of Doug Pluss, p. 47, lns. 1-4, attached as <u>Exhibit G</u>.)

11.     MFP's ownership structure is rather convoluted.  The three actual members of MFP are Joint Pluss Eagle Highlands, LLC, a limited liability company, the two (2) members of which are Douglas A. Pluss and Pluss Investment Company LLC, a limited liability company, the members of which are seven (7) trusts, namely, P-100 Trust, the trustee of which is Sam Pluss Jr.; P-200 Trust, the trustee of which is also Sam Pluss Jr.; P-300 Trust, the trustee of which is James H. Pluss; P-400 Trust, the trustee of which is also James H. Pluss; P-500 Trust, the trustee of which is also James H. Pluss; Sam Pluss Family Trust, the trustee of which is Douglas A. Pluss; and James Pluss Family Trust, the trustee of which is Sam Pluss Jr.; DSF Polo

Run, LLC, a limited liability company, the sole member of which is David S. Frishman; and, ASM Polo Run, LLC, a limited liability company, the sole member of which is Andrew S. Miller. (Dkt. 6, Pl.'s Amend. Compl., ¶ 1.)

12. Pluss is a former tax attorney who practiced as such for over 20 years before becoming, in his words, an "entrepreneur" who specializes in "real estate development . . . real estate investment [and] some oil and gas and private equity investment." (Ex. G, Pluss. Dep., p. 13, lns. 17-24; p. 14, lns. 9-12.) Pluss estimates that, while a practicing attorney, he was involved in hundreds of real estate acquisitions and dispositions. (Ex. G, Pluss Dep., p. 32, lns. 6-15.) He is a member in over 25 different limited liability companies; and has invested in several office buildings. (Ex. G, Pluss Dep., p. 43, lns. 9-18; p. 248, lns. 1-5.)

13. Frishman's primary business activity is real estate investing. (Ex. G, Pluss Dep., p. 27, lns. 5-8.) Fishman operates under the name of Realty Funding. (Ex. G, Pluss Dep., p. 29, lns. 10-13.)

14. Miller has engaged in a number of real estate related activities, including real estate development, real estate brokerage, and real estate investing. Miller operates under the name Sevo-Miller. (Ex. G, Pluss Dep., p. 28, ln. 22 – p. 29, ln. 6.)

15. Pluss, Frishman, and Miller have been investing in real estate ventures since the late 1980s. Pluss estimates that they have been involved in at least 10 to 12 real estate projects. (Ex. G, Pluss. Dep., p. 26, lns. 9-13.)

16. Pluss's real estate investments are made as the owner of an LLC. Pluss acknowledges that an LLC is a business entity. (Ex. G, Pluss Dep., p. 17, ln. 21 – p. 18, ln. 2.)

17. According to Black's Law Dictionary, "business entities" and "business associations" are interchangeable terms. A true and accurate copy of the definition of "business

associations" from Black's Law Dictionary, 157 (Abridged. 7th ed. 1999) is attached as <u>Exhibit</u> <u>H</u>.

18. Pluss, Frishman, and Miller even formed a company, Rapid Funding, to finance third-party real estate acquisitions in the range of $500,000 to $2 million.  (Ex. G, Pluss Dep., p. 39, ln. 18 – p. 41, ln. 4.)

19. Their real estate investment projects have grown so sophisticated that they formed SMF Acquisition, which exists for the sole purpose of contracting to purchase real estate.  SMF Acquisition's contractual right to purchase the real estate is then assigned to a new business association later formed by Pluss, Frishman, and Miller.  (Ex. G, Pluss Dep., p. 144, ln. 17 – p. 146, ln. 12.)

C. <u>MFP's Knowledge of AHN's Absolute Right to Assign the Lease and Its Decision to Move Forward with the Acquisition of The Pointe.</u>

20. Miller learned that The Pointe was available from a representative of Huntington Bank, and brought this opportunity to the attention of Pluss and Frishman.  (Ex. G, Pluss Dep., p. 51, lns. 17-25.)

21. Prior to purchasing The Pointe, Pluss, Frishman, and Miller were provided with a document prepared by CB Richard Ellis (who was marketing the property) entitled "Investment Offering Memorandum."  (Ex. G, Pluss Dep., p. 52, lns. 8-14.)  A true and accurate copy of the Investment Offering Memorandum is attached as <u>Exhibit I</u>, Bates No. MFP 001010 – MFP 001021.

22. The Investment Offering Memorandum very clearly sets forth a summary of AHN's right to assign under the lease.  It states:

<u>Subletting</u>
Tenant may not assign this Lease or sublet the Leased Premises or any part thereof, without the prior written consent of Landlord, which consent shall not be

unreasonably withheld; and any attempted assignment or subletting without such consent shall be invalid.

Notwithstanding previous provisions, Tenant has an absolute right during any term, option period, extension or renewal of this office lease to assign or sublease to all or any subset of the following persons whether it be to them as individuals or in any business association: Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D., and any future American health Network Eagle Highland Physicians. In addition, further notwithstanding any previous provisions, Landlord agrees that the assignment or sublease to Eagle Highlands Physicians will result in Landlord immediately releasing Tenant from all liability under this office lease.

(Ex. I, Investment Offering Memorandum, p. 7, Bates No. MFP 001018.[1])

23.     Pluss received and reviewed this Investment Offering Memorandum prior to purchasing The Pointe. (Ex. I, Pluss Dep., p. 120, lns. 23 – p. 121, ln. 11.)

24.     As Pluss, Frishman, and Miller moved forward with their plan to purchase The Pointe, they obtained a draft Tenant Estoppel Certificate from AHN through the seller of The Pointe via e-mail. (Ex. G, Pluss Dep., p. 151, ln. 5 - p. 152, ln. 13.) A true and accurate copy of the Draft Tenant Estoppel Certificate and the accompanying e-mail dated November 19, 2004 are attached as Exhibit J, Bates Nos. MFP 001238 – MFP 001242.

25.     The Draft Tenant Estoppel Certificate very clearly sets forth a summary of AHN's absolute right to assign the Lease. It states:

Tenant has accepted delivery of 15,458 square feet of the Premises (the "Demised Premises") commonly known as suite No. 110 and has entered into occupancy thereof; and is conducting business therein. The Lease has not been assigned or sublet or been the subject of any lien or encumbrance; however, we wish to advise you that, pursuant to Section 11.02 of the Lease, Tenant has the absolute right to assign its interest in the Lease or to sublease the Leased Premises to Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D., or either of them, or other Eagle Highland Physicians of Tenant, or any business association they form, upon which event Tenant shall be relieved of all liability under the Lease.

---

[1] The Bates label designation "MFP" signifies that the document was produced by MFP during this litigation.

(Ex. J, Draft Tenant Estoppel Certificate and accompanying e-mail dated November 19, 2004, p. 3, Bates No. MFP 001241.)

26.     An e-mail from Howard Cohen at Locke Reynolds that accompanied the Draft Tenant Estoppel Certificate specifically asked whether this Draft Tenant Estoppel Certificate caused any problems.  (Ex. J, Draft Tenant Estoppel Certificate and accompanying e-mail dated November 19, 2004, p. 1, Bates No. MFP 001238.)   However, Pluss could not recall any problem or objection being made by Pluss, Frishman, Miller or their counsel.  (Ex. G, Pluss Dep., p. 155, ln. 13 – p. 156, ln. 24.)

27.     Prior to purchasing The Pointe, Pluss and Miller (and possibly Frishman) discussed the possibility of losing AHN as a tenant, as a result of AHN's absolute right to assign the Lease.  But, they simply assumed that such an assignment would not happen.  (Ex. G, Pluss Dep., p. 132, ln. 5 – p. 133, ln. 20.)

28.     The Draft Tenant Estoppel Certificate was finalized and sent to Pluss, Frishman, and Miller and made a part of the closing documents for their purchase of The Pointe.  (Ex. G, Pluss Dep., p. 160, ln. 11 – p. 161, ln. 10.)   A true and accurate copy of the Tenant Estoppel Certificate is attached as Exhibit K, Bates Nos. MFP 00088 – MFP 00090.)

29.     The final Tenant Estoppel Certificate contains the same language regarding AHN's absolute right to assign the lease to any business association formed by Dr. Reitz and Dr. Adams.  It states:

> The Lease has not been assigned or sublet or been the subject of any lien or encumbrance; however, we wish to advise you that, pursuant to Section 11.02 of the Lease, Tenant has the absolute right to assign its interest in the Lease or to sublease the Leased Premises to Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D., or either of them, or other Eagle Highland Physicians of Tenant, or any business association they form, upon which event Tenant shall be relieved of all liability under the Lease.

(Ex. K, Tenant Estoppel Certificate, pp. 1-2, Bates Nos. MFP 00088 – MFP 00089.)

30.     Again, Pluss cannot recall anyone ever raising an objection to the Tenant Estoppel Certificate.  (Ex. G, Pluss Dep., p. 163, ln. 18 – p. 164, ln. 1.)

31.     Pluss, Frishman, and Miller even had a copy of the actual Lease, but they did not bother to read it before closing.  In Pluss's own words, Frishman and Miller "are not document readers."  Instead, they left those details to their counsel.  (Ex. G, Pluss Dep., p. 149, lns. 10-23; p. 253, ln. 21 – p. 254, ln. 4.)

32.     In addition to these documents, Pluss, Frishman, and Miller also had a copy of an appraisal performed by Terzo & Bologna, Inc. (the "Appraisal").  A true and accurate copy of the Appraisal is attached as <u>Exhibit L</u>, Bates Nos. MFP 001116 – MFP 001237.)

33.     The Appraisal estimated the value of The Pointe as of November 1, 2004 to be $3,850,000 "as is" and $5,250,000 upon stabilization.  (Ex. L, Appraisal, p. 3, Bates No. MFP 001118.)

34.     Pluss, Frishman, and Miller purchased The Pointe for $3.4 million.  (Ex. G, Pluss Dep., p. 129, lns. 9-15.)

D.     <u>Pursuant to Section 11.02, AHN Assigns the Lease to LALR, a Business Association Formed by Dr. Reitz and Dr. Adams.</u>

35.     In late 2004 and early 2005, a disagreement arose between Dr. Reitz, Dr. Adams, and AHN concerning the doctors' compensation.  According to AHN's calculations, in March 2005, the amount owed to AHN by Dr. Reitz and Dr. Adams exceeded $400,000.  (Ex. B, Sikand Dep., p. 64, lns. 6-19.)

36.     Dr. Reitz left AHN some time in 2005.  (Ex. B, Sikand Dep., p. 56, lns. 9-17.)

37.     As a result of Dr. Reitz's departure, AHN began taking the steps necessary to assign the Lease, and negotiations between AHN and Dr. Reitz and Dr. Adams continued until

March 3, 2006. (Ex. A, Adams Dep., p. 94, lns. 15-23; p. 109, ln. 8 – p. 110, ln. 18; p. 139, lns. 19-24.)

38.     Much like the pains taken by AHN to notify Pluss, Frishman, and Miller about its absolute right of assignment, AHN took steps to keep MFP informed of AHN's intentions. For example, on April 20, 2005, counsel for AHN sent a letter to MFP's principals informing them of the anticipated assignment. The letter states:

> AHN anticipates either assigning the lease or subleasing all or a portion of the above referenced Leased Premises to a limited liability company formed by Dr. Lawrence A. Reitz and/or Dr. [Laurence M.] Adams, all as contemplated by Section 11.02 of the Lease. We anticipate that such an assignment and/or subletting will occur in the near future. As you know, pursuant to said Section 11.02 of the Lease, upon such an assignment or subletting, AHN is released from any and all liability thereafter accruing under the Lease.

(Ex. G, Pluss Dep., p. 190, lns. 10-22; April 20, 2005 letter from AHN's counsel to MFP, a true and accurate copy of the April 20, 2005 letter is attached as Exhibit M.)

39.     MFP directed its counsel to respond, which he did on April 26, 2005. (Ex. G, Pluss Dep., p. 192, lns. 2-25; April 26, 2005 letter from MFP's counsel to AHN, a true and accurate copy of the April 26, 2005 letter is attached as Exhibit N.)

40.     In this response, MFP, by its counsel, endorsed the use of Black's Law Dictionary to define the terms contained in the lease. But, rather than use the definition of "business association" as used in the Lease, MFP opted to use the inapplicable definition of "association," to bolster its argument that the Lease's assignment provision did not permit assignment to a limited liability company formed by Dr. Reitz and Dr. Adams. (Ex. N, April 26, 2005 letter.)

41.     AHN responded, by counsel, on May 25, 2005, stating that MFP's interpretation was not supported by either Black's Law Dictionary or Indiana law. AHN pointed out that Black's Law Dictionary has a definition of "business association" apart from the definition of

"association" and that the correct definition includes a limited liability company. AHN also reminded MFP that MFP knew when it acquired the property that AHN had the right to assign the Lease to a business association formed by Dr. Reitz or Dr. Adams. (Ex. G, Pluss Dep., p. 202, lns. 17-25; May 25, 2006 letter from AHN's counsel to MFP, a true and accurate copy of the May 25, 2005 letter is attached as <u>Exhibit O</u>.)

42. Black's Law Dictionary defines business associations as follows:

Business associations. See BUSINESS ENTERPRISES.

\*　　　\*　　　\*

Business enterprises**.** The field of law dealing with various forms of business, such as corporations, *limited liability companies*, and partnerships. – Also termed *business entities; business associations*.

(Ex. H, Definition of Business Associations, Black's Law Dictionary, 157 (Abridged. 7th ed. 1999)).

43. During his time as a practicing attorney, Pluss himself used and recognized Black's Law Dictionary as an authority on definitions used in the practice of law. (Ex. G, Pluss Dep., p. 193, lns. 19-23.)

44. Dr. Reitz and Dr. Adams formed LALR d/b/a Eagle Highlands Physicians in order to accept the Lease from AHN. LALR was organized as a limited liability company. (Ex. C, Reitz Dep., p. 129, lns. 18-21; Ex. A, Adams Dep., p. 148, lns. 7-21.)

45. On March 3, 2006, AHN assigned the Lease to LALR d/b/a Eagle Highlands Physicians. A true and accurate copy of the Assignment and Assumption of Lease is attached as <u>Exhibit P</u> Bates Nos. MFP 00041 – MFP 00056.

46. On May 1, 2006, AHN notified MFP of the assignment. (Ex. G, Pluss Dep., p. 196, lns. 6-23; May 1, 2006 letter from AHN to MFP, a true and accurate copy of the May 1, 2006 letter is attached as <u>Exhibit Q</u>.)

47.    Following the assignment, AHN subleased The Pointe office space from LALR pursuant to a Sublease Agreement.  A true and accurate copy of the Sublease Agreement is attached as <u>Exhibit R</u>.

48.    The Sublease Agreement permitted AHN to terminate the sublease so long as it provided ninety (90) days written notice to LALR provided that the termination would not be effective prior to the first anniversary of the sublease.  (Ex. R, Sublease Agreement, Section 11 – Termination Right, p. 3.)

49.    On November 29, 2006, AHN gave the requisite ninety days written notice of its intent to terminate the sublease, and the sublease was terminated effective March 3, 2007.  (A true and accurate copy of the November 29, 2006 notice is attached as <u>Exhibit S</u>.)

E.    <u>MFP's Agent, The Pointe's Property Manager, Acknowledges the Assignment.</u>

50.    On or about March 22, 2006, MFP entered into a Management Agreement with CB Richard Ellis.  (Ex. G, Pluss Dep., p. 222, ln. 13 – p. 223, ln. 23.)  A true and accurate copy of the Management Agreement is attached as <u>Exhibit T</u>, Bates Nos. MFP 000311 – MFP 000334.

51.    As set forth in the Management Agreement, CB Richard Ellis was charged with notifying MFP of any defaults under the existing leases.  (Ex. G, Pluss Dep., p. 223, ln. 5 – p. 224, ln. 7; Ex. T, Management Agreement, Section 4.8(a)(vi) – Complaints and Notices, p. 4, Bates No. MFP 000314.)

52.    The Management Agreement also charges CB Richard Ellis with using reasonable and diligent efforts to enforce the terms of all leases.  (Ex. G, Pluss Dep., p. 224, lns. 8-13; Ex. T, Management Agreement, Section 4.10 – Enforcement of Leases and Deposit of Revenue, p. 5, Bates No. MFP 000315.)

53.    Kim Woodall ("Woodall") was the property manager for The Pointe under this Management Agreement.  (Ex. G, Pluss Dep., p. 221, lns. 5-10.)

54.     On December 4, 2006, Woodall sent an e-mail to Pluss, Frishman, and Miller, among others, which stated, "According to Section 11.02 of the lease, once [AHN] assigned the lease to the Eagle Highlands Physicians they were released of all liability under the original lease." (Ex. G, Pluss Dep., p. 214, lns. 17-25.) A true and accurate copy of this December 4, 2006 e-mail is attached as <u>Exhibit U</u>.

55.     On March 2, 2007, Woodall sent an e-mail to Pluss, Frishman, and Miller, among others, which stated, "I explained to Mike [counsel for LALR] the original lease was with [AHN] and then assigned to LALR Enterprises, LLC. LALR then turned around and sub-let the space to [AHN]. I brought to his attention this mean[s] LALR Enterprises, LLC is still responsible for the lease." (Ex. G, Pluss Dep., p. 215, lns. 7 – 21.) A true and accurate copy of this March 2, 2007 e-mail is attached as <u>Exhibit V</u>.

## IV.     ARGUMENT

Despite the number of claims MFP asserted in this lawsuit, the purpose of the lawsuit is simple - it is nothing more than a desperate ploy to maximize profits on one of MFP's principals many speculative real estate investments. A review of MFP's allegations, however, reveals that its claims lack any legal substance.

As set forth in the Lease, AHN possessed the absolute right to assign the Lease to a business association formed by Dr. Reitz and Dr. Adams. MFP knew of this right when it acquired the property. Moreover, MFP's principals understood and even discussed its impact prior to purchasing The Pointe. Nevertheless, MFP has filed suit alleging five claims against AHN: (1) that AHN breached the Lease; (2) that AHN breached the sublease with LALR; (3)

that AHN fraudulently transferred the Lease to LALR; (4) that AHN engaged in criminal fraud; and (5) that AHN engaged in constructive fraud.[2]

Each of these claims is nothing more than MFP's attempt to avoid the express language of the Lease which permits AHN, in its absolute discretion, to assign the Lease to LALR.

A.     Breach of Lease – Count I of the Amended Complaint.

In Count I of their Amended Complaint, MFP claims that AHN breached the Lease because "LALR is not a person to which AHN could assign the Lease without MFP's consent . . ." (*Dkt.* 6, Pl.'s Am. Compl. ¶ 26).  MFP's claim ignores the plain language of the Lease.

The Lease contained a specifically bargained-for provision that provided AHN with "**an absolute right . . . to assign or sublease to all or any subset of the following persons whether it be to them as individuals or in any business association: Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D. . . . .**"  (Ex. D, Lease, § 11.02, emphasis added).  Pursuant to its *absolute right* under the Lease, AHN assigned the Lease to LALR, a business association formed by Dr. Reitz and Dr. Adams.

### 1.     AHN Possessed the Absolute Right to Assign the Lease to LALR.

As a rule, AHN requires all of its leases to have either a provision permitting AHN to terminate the lease without penalty at any time, or a provision that permits AHN to assign a lease to the physicians or a business association that they form.  (Ex. E, Park Dep., p. 29, ln. 21 – p. 30, ln. 2; Ex. F, Hill Dep., p. 31, lns. 5-17.)  The reason is simple; AHN does not want to be saddled with lease obligations in the event that the physicians who occupy the leased space decide to leave AHN.

---

[2] In its Amended Complaint, MFP also asserted a veil-piercing claim and a tortious interference claim (*Dkt.* 6). However, these claims are directed to Dr. Reitz, Dr. Adams, and LALR, not AHN.

In this case, AHN specifically negotiated the absolute right to assign the Lease to Dr. Reitz, Dr. Adams, or any business association that they formed. That right was set forth in Section 11.02 of the Lease, which provides that:

> Tenant shall have an ***absolute right*** during any term, option period, extension or renewal of this Office Lease ***to assign or sublease to all or any subset of the following persons whether it be to them as individuals or in a business association: Lawrence A. Reitz, M.D. and Laurence*** [*sic*] ***M. Adams, M.D.*** and any future American Health Network Eagle Highland Physicians (all hereinafter referred to as "Eagle Highlands Physicians") from Landlord. And further notwithstanding any provisions above, Landlord agrees that the assignment or sublease to Eagle Highlands Physicians will result in Landlord immediately releasing Tenant from all liability under this Office Lease.

(Ex. D, Lease, § 11.02, emphasis added). This provision of the Lease unambiguously provides AHN with the ***absolute*** right to assign the Lease to Dr. Reitz and Dr. Adams in their individual capacity **or** to any business association that they form.

In an effort to avoid the clear intent of this provision of the Lease, MFP has essentially taken the position that the Lease could only be assigned to Dr. Reitz and Dr. Adams in their individual capacities so that they would become personally liable under the Lease. (Ex. N, April 26, 2005 letter). Such a tortured reading strains credibility, however, as Section 11.02 expressly provides that AHN can assign the Lease to Dr. Reitz and Dr. Adams as individuals **or** to them in a business association. Any other interpretation renders the language empowering AHN to assign the Lease to Dr. Reitz and Dr. Adams as individuals, as opposed to a business association that they may form, meaningless in contravention of Indiana law. *See*, *e.g.*, *Ball v. Versar*, 454 F. Supp.2d 783, 802 (S.D. Ind. 2006) *citing Kiltz v. Kiltz*, 708 N.E.2d 600, 603 (Ind. Ct. App. 1999) (the court must interpret a contract so as not to render words**,** phrases, or terms ineffective or meaningless).

## 2. LALR is a Business Association Formed by Dr. Reitz and Dr. Adams.

MFP has also taken the position that a limited liability company such as LALR is not a "business association." (Ex. N, April 26, 2005 letter). This position is absurd.[3]

The Indiana Legislature has defined the term business association to include limited liability companies. *See, e.g.*, Ind. Code Ann. § 32-34-1-5 ("'business association' means the following: (1) a corporation. (2) *A limited liability company . . . .*") (Emphasis added). LALR is a limited liability company organized under the Indiana Business Flexibility Act, which falls within Title 23 of the Indiana Code, "Business and Other Associations." (Ex. C, Reitz Dep., p. 129, lns. 18-21; Ex. A, Adams Dep., p. 148, lns. 7-21.)

Finally, Black's Law Dictionary also includes limited liability companies in the definition of "business associations." Black's defines business associations as follows:

> Business associations. See BUSINESS ENTERPRISES.
>
> *                *                *
>
> Business enterprises**.** The field of law dealing with various forms of business, such as corporations, ***limited liability companies*,** and partnerships. – Also termed ***business entities; business associations***.

(Ex. H, Black's Law Dictionary 157 (Abridged. 7th ed. 1999, emphasis added in bold and italics)). Simply put, no matter how MFP attempts to spin it, MFP cannot escape the fact that LALR is a business association.

---

[3] In a transparent attempt to create an ambiguity or a factual question where none exists, Pluss, one of MFP's principals, went to great lengths in his deposition to feign ignorance over the meaning of the term "business association." Despite Pluss's protestations that he is not an expert in words or their definitions, it is inconceivable that someone with Pluss's background – over two decades as both a practicing tax attorney, which included providing complex tax structuring advice to a variety of partnerships, corporations, and limited liability corporations specifically tailored to meet the needs of each business form, and a sophisticated real estate speculator, as well as a member of a multitude of limited liability corporations – would be unable to explain that a limited liability company is a "business association." (Ex. G, p. 13, lns. 17-24, p. 14, lns. 9-12, p. 183, lns. 1-6, p. 248, lns. 1-5, p. 269, ln. 24 – p. 270, ln. 3.)

### 3.     The Assignment Released AHN from all Liability.

Not only did the Lease provide AHN with the absolute right to assign the Lease to Dr. Reitz and Dr. Adams or any business association they formed, but it also contained a release clause expressly absolving AHN of all liability following such an assignment: "And further notwithstanding any provisions above, Landlord agrees that the assignment or Sublease to Eagle Highland Physicians will result in Landlord immediately releasing Tenant from all liability under this office Lease." (Ex. D, Lease, § 11.02).

The interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances, *Prall v. Indiana Nat. Bank*, 627 N.E.2d 1374, 1377 (Ind. Ct. App. 1994). If the release is unambiguous, the court looks only to the language of the release to ascertain the parties' intent. *Zollman v. Geneva Leasors Assocs., Inc.,* 780 N.E.2d 387, 392 (Ind. Ct. App. 2002). "Our supreme court has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes." *Prall*, 627 N.E.2d at 1377. More importantly, Indiana courts have previously enforced release clauses that absolve a lessee of all liability following the assignment of the lease. *See Shadeland Development Corp. v. Meek*, 489 N.E.2d 1192, 1197 (Ind. Ct. App. 1986).

As in *Shadeland*, AHN was released from all liability once it assigned the Lease to LALR. The Lease clearly states that upon assignment of the Lease, AHN is released from all liability. No further interpretation of the release clause is necessary.

### 4.     MFP's Own Agent, its Property Manager, Recognized that LALR Assumed all Liability under the Lease.

AHN's rights under this assignment provision are so clear that everyone (except of course MFP) has recognized that the Lease was assigned to LALR and that AHN was released

from all liability. However, MFP cannot bury its head in the sand and pretend that it does not understand what happened. Both AHN and LALR agreed that LALR accepted all of AHN's rights and obligations under the Lease when LALR accepted the assignment. (Ex. P, Assignment and Assumption of Lease, ¶ C.) And MFP's own property manager, Woodall, acknowledged that LALR assumed all liability under the Lease when it accepted the Lease assignment from AHN.

By way of background, after MFP acquired The Pointe, MFP entered into a Management Agreement with CB Richard Ellis to serve as the property manager. (Ex. G, Pluss Dep., p. 222, ln. 13 – p. 223, ln. 23.) Pursuant to the terms of the Management Agreement for The Pointe, Woodall, the CB Richard Ellis property manager responsible for The Pointe, was responsible for notifying MFP of any defaults under existing leases and using reasonable and diligent efforts to enforce the terms of those leases. (Ex. G, Pluss Dep., p. 223, ln. 5 – p. 224, ln. 7; p. 224, lns. 8-13; Ex. T, Management Agreement, Section 4.8(a)(vi) – Complaints and Notices, p. 4, and Section 4.10 – Enforcement of Leases and Deposit of Revenue, p. 5.)

In that capacity, Woodall was required to identify and notify MFP of any breach of any lease at The Pointe and to enforce MFP's rights under any such lease. Tellingly, following the assignment to LALR, she did not notify MFP that AHN breached the Lease because there was no breach. Rather, in two separate e-mails she stated that AHN had validly assigned the Lease, and that LALR was now liable under the Lease.

In her first such e-mail, sent after the Lease was assigned, Woodall stated to MFP's principals, "**According to Section 11.02 of the lease, once [AHN] assigned the lease to the Eagle Highlands Physicians they were released of all liability under the original lease**." (Ex. G, Pluss Dep., p. 214, lns. 17-25; Ex. U, December 4, 2006 e-mail.) In her second such e-mail,

sent after AHN terminated the sublease, Woodall stated to MFP's principals, "I explained to Mike [counsel for LALR] the original lease was with [AHN] and then assigned to LALR Enterprises, LLC. LALR then turned around and sub-let the space to [AHN]. **I brought to his attention this mean[s] LALR Enterprises, LLC is still responsible for the lease**." (Ex. G, Pluss Dep., p. 215, lns. 7 – 21; Ex. W, March 2, 2007 e-mail.)

Woodall's acknowledgment of the validity of the assignment and the release of AHN in these e-mails are particularly damaging to MFP given that she was the person charged with determining whether a breach of any lease at The Pointe occurred and taking appropriate steps to enforce MFP's rights under any lease. In other words, Woodall was MFP's agent and, as MFP's agent, her statements are binding. *See Oil Supply Co., Inc. v. Hires Port Service, Inc.*, 726 N.E.2d 246, 248 (Ind. 2000) (an agent is one who acts on behalf of some person, with that person's consent and subject to that person's control); *see also Yellow Mfg. Acceptance Corp. v. Voss*, 303 N.E.2d 281, 284 (Ind. Ct. App. 1973) (statements of an agent are binding on the principal).

Even if Woodall's statements did not conclusively establish the validity of AHN's assignment of the Lease to LALR, her acknowledgement of AHN's right to assign to LALR and consequent release from liability underscores the absurdity of MFP's position in this lawsuit.

B.   Breach of Sublease – Count II of the Amended Complaint.

In Count II of the Amended Complaint, MFP hedges its bets by arguing that even if the assignment to LALR was valid, as it was, then AHN remains liable to MFP based on a breach of its Sublease Agreement with LALR. Tellingly, MFP neglects to explain how exactly AHN allegedly breached the sublease. This is unsurprising because there was no breach. As the undisputed facts demonstrate, the Sublease Agreement provided both AHN and LALR with the right to terminate the sublease upon written notice. AHN provided written notice as required by

the Sublease. Accordingly, AHN did not breach the Sublease Agreement. Further, to the extent

that MFP was harmed in any way by the sublease, it must look to its tenant, LALR, not AHN.

### 1. AHN Properly Terminated its Valid Sublease with LALR.

On March 3, 2006, AHN assigned the Lease to LALR and thereby relinquished any

obligations under the Lease. AHN and LALR then entered into a Sublease Agreement. Section

11 of the Sublease Agreement governed the parties' termination rights:

> Notwithstanding anything herein contained to the contrary, either Sublessor or
> Sublessee may, at its election, cancel and terminate the Term of this Sublease
> upon not less than ninety days (90) days prior written notice to the other party;
> provided, however, that such termination shall not be effective earlier than the
> first anniversary of the Effective Date of this Sublease.

(Ex. R, Sublease Agreement, ¶ 11.)

Under the terms of the Sublease Agreement, AHN was free to terminate the sublease so

long as: (1) AHN provided LALR with ninety (90) days written notice; and (2) the termination

occurred at least one year from the Effective Date of the Sublease Agreement, March 3, 2006.

AHN's termination of the sublease satisfied both of these requirements.

On November 29, 2006, AHN provided written notice of its desire to terminate the

sublease in a letter from AHN's counsel to LALR. (Ex. S, November 29, 2006 notice.) On

March 3, 2007, ninety-four (94) days after providing the written notice to LALR, AHN

terminated the sublease with LALR. The termination occurred one year after the effective date

of the Sublease Agreement. Accordingly, AHN satisfied both requirements of Section 11 of the

Sublease Agreement. MFP has not set forth any evidence to dispute AHN's valid termination of

the sublease.

### 2. LALR Remains Liable, Even After the Sublease.

MFP's allegation that AHN breached the sublease must fail as a matter of law not only

because AHN complied with the terms of the Sublease Agreement, but also because any liability

associated with the Lease or Sublease Agreement remained with LALR.  The express terms of the Assignment and Assumption of the Lease clearly state that all liability under the Lease transferred to LALR upon assignment:

> Assignor desires to assign its rights and obligations under the Lease to Assignee pursuant to Section 11.02 of the Lease, and Assignee desires to accept and assume Assignor's rights and obligations under the Lease from the date hereof forward.

(Ex. P, Assignment & Assumption of Lease).

Not only did LALR accept all liability under the Lease upon assignment, but that liability remained with LALR even after AHN subleased the office space back from LALR.  "An assignment is a transfer by a lessee of one's entire leasehold interest, while a sublessor transfers less than his entire leasehold interest . . ."  *Bd. of Com'rs of Delaware County v. Lions of Delaware County Fair, Inc.*, 580 N.E.2d. 280, 284 (Ind. Ct. App. 1991).  Thus, the sublease did not relieve LALR of its obligation to pay rent to MFP following the assignment.  *Shadeland*, 489 N.E.2d at 1199.  Additionally, because the liability remains with the tenant, a landlord generally has no right of action against a subtenant for non-payment of rent, there being no privity of contract or estate.  *Indian Refining Co. v. Roberts*, 181 N.E. 283, 285 (Ind. Ct. App. 1932).

Any contractual obligation that AHN assumed pursuant to the Sublease Agreement was terminated along with the sublease on March 3, 2007.  It is beyond dispute that LALR, not AHN, is the sole party required to fulfill any conditions pursuant to the Lease from that date forward.

C.    MFP's "Fraud-Based" Claims Lack the Requisite Specificity.

Faced with the prospect of a Lease it wishes in hindsight that it had not assumed and cannot re-write, MFP has also attempted to bolster its bargaining position by asserting a series of baseless fraud claims.  A review of the undisputed facts, however, reveals that these allegations have no more substance than MFP's absurd arguments regarding AHN's ability to assign the Lease to a business association.  Moreover, in attempting to cobble together fraud claims where

none exist, MFP has failed to meet the stringent pleading standards of Federal Rule of Civil Procedure 9(b). Further, exercising a contractual right cannot be construed as bad intent. *See*, *e.g.*, *PSI Energy, Inc. v. Exxon Coal USA, Inc.,* 17 F.3d 969, 972 (7th Cir. 1994); *Khom & Nate's Shoes No. 2, Inc. v. First Bank of Whitney,* 908 F.2d 1351, 1357 (7th Cir. 1990).

MFP's Complaint asserts three separate fraud-based claims—one based on the Indiana Uniform Fraudulent Transfer Act ("IUFTA"), one based on the Criminal Fraud Statute, and one based on common-law constructive fraud. Indiana courts treat claims under IUFTA as a type of fraud claim. *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338, 347 (7th Cir. 2004). And both the criminal fraud claim under I.C. § 35-43-5-4(8) and the common law constructive fraud claim are indisputably fraud-based claims. Accordingly, all three claims are governed by Federal Rule of Civil Procedures Rule 9(b), which requires all averments of fraud to be plead with specificity. *Hirata Corp. v. J.B. Oxford & Co.*, 193 F.R.D. 589, 592 (S.D. Ind. 2000). "By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a pre-complaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). MFP's allegations fall far short of satisfying the Rule 9(b) standard.

D.     Count III: Fraudulent Transfer.

In light of AHN's absolute right to assign the Lease to a business association such as LALR, MFP must state with specificity some additional basis by which AHN's exercise of its contractual right of assignment constitutes fraud. *See PSI Energy, Inc.,* 17 F.3d at 972. ("An obligation to negotiate in good faith is not an obligation to be kind to one's trading partner or to refrain from taking commercial advantage of the contractual provisions one has negotiated."); *Kham & Nate's Shoes No. 2, Inc.,* 908 f.2d at 1357. ("Firms that have negotiated contracts are

entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of good faith."). Accordingly, MFP's fraud claims must contain something more than a mere allegation that AHN exercised its contractual right to assign the Lease. Because they do not, MFP's fraud allegations fail to satisfy the stringent pleadings requirements of Rule 9(b).

Moreover, MFP is stuck with its deficient pleading. Only the allegations of the Amended Complaint may be considered in evaluating the merits of MFP's fraud claims. *Cont'l Basketball Assn. Inc. v. Ellenstein Enters., Inc.*, 669 N.E.2d 134, 137 (Ind. 1996). Regardless of the deficiency of their pleadings, however, the undisputed facts clearly show that MFP does not have a valid claim for a fraudulent transfer.

The facts demonstrate that MFP was well aware of the assignment provision prior to its purchase of The Pointe. In fact, MFP was made directly aware of the provision on multiple occasions. First, CB Richard Ellis provided MFP with the Investment Offering Memorandum that contained the Lease's assignment provision, which MFP reviewed. (Ex. I, Investment Offering Memorandum, p. 7; Ex. G, Pluss Dep., p. 120, lns. 23 – p. 121, ln. 11.) Next, AHN provided MFP with a Draft Tenant Estoppel Certificate, once again setting forth the Lease's assignment provision. (Ex. J, Draft Tenant Estoppel letter, pg. 3; Ex. G, Pluss Dep., p. 151, ln. 5 – p. 152, ln. 18). Finally, MFP's principals had a copy of the Lease prior to closing, but never bothered to read it. (Ex. G, Pluss Dep., p. 149, lns. 10-23; p. 253, ln. 21 – p. 254, ln.4.)

Even prior to assigning the Lease to LALR, AHN repeatedly informed MFP of its intent to assign the Lease. For example, on April 20, 2005, counsel for AHN sent a letter to MFP's principals informing them of the anticipated assignment. (Ex. G, Pluss Dep., p. 190, lns. 10-22; Ex. M, April 20, 2005 letter). Following MFP's objection to AHN's proposed assignment,

AHN's counsel sent MFP another letter, further explaining AHN's position and legal authority supporting the proposed assignment. (Ex. G, Pluss Dep., p. 202, lns. 17-25; Ex. O, May 25, 2005 letter). On May 1, 2006, AHN then provided MFP with written notice of the assignment. (Ex. G, Pluss Dep., p. 196, lns. 6-23; Ex. Q, May 1, 2006 letter).

AHN went out of its way to ensure that MFP was aware of AHN's absolute right to assign the Lease prior to MFP's purchase of The Pointe. AHN kept MFP informed of both its intent to assign the Lease and the ultimate assignment of the Lease to LALR. Accordingly, the undisputed facts demonstrate that not only has MFP failed to plead its fraudulent transfer claim with specificity, but that it could never do so in the first place because there was no fraud.

### 1. MFP Cannot Show Fraudulent Intent as a Matter of Law.

Aside from its baseless complaints concerning a Lease it accepted without complaint, MFP has not set forth a single fact to support its allegation that MFP acted with fraudulent intent when it assigned the Lease to LALR. This failure is ultimately factual to MFP's fraud claims. It is axiomatic that a creditor who seeks to have a transfer set aside as fraudulent bears the burden of proving that such transfer was made with fraudulent intent. *Med. & Prof'l Collection Servs., Inc.,* 734 N.E.2d at 630. In determining whether or not a conveyance is fraudulent, the basic question is whether the transaction was a bona fide transaction or whether it was a mere trick or contrivance for the purpose of defeating creditors. *U.S. v. Denlinger*, 982 F.2d 233 (7th Cir. 1992). A failure to demonstrate fraudulent intent should result in summary judgment in favor of the debtor. *Garza v. Lorch*, 705 N.E.2d 468, 473 (Ind. Ct. App. 1998). The undisputed facts of this matter not only demonstrate that AHN lacked the requisite fraudulent intent when it assigned the Lease to LALR, but also that the assignment was a bona fide transaction.

AHN negotiated the assignment provision over four years before MFP acquired its interest in The Pointe as part of its standard operating procedure. (Ex. D, Lease; Ex. E, Park

Dep., pp. 29-30.) Moreover, MFP admits that it was aware of the Lease and the assignment provision when it acquired its interest in the property. (Ex. G, Pluss Dep., pp. 177-178). Indeed, it would have been almost impossible for MFP not to have been aware of Section 11.02 prior to their purchase of The Pointe. The Lease, and its assignment provision, was first disclosed to MFP in CB Richard Ellis' initial investment presentation for The Pointe (Ex. I, Investment Offering Memorandum.) Both the Lease and the assignment provision were disclosed once again in the Draft Tenant Estoppel Letter provided by AHN. (Ex. K, Tenant Estoppel Letter.) And they were disclosed yet again in the Tenant Estoppel Certificate (Ex. K, Assignment and Assumption of Leases.)

Not only was MFP aware of the Lease and assignment provision, but MFP also understood its implications. MFP, and its associated principals and investor companies, are sophisticated investors with an extensive history in real estate development. (Ex. G, Pluss Dep., p. 13, lns. 17-24; p. 14, lns. 9-12; p. 26, lns. 9-13; p. 43, lns. 9-18; p. 248, lns. 1-5.) Moreover, Pluss is a law school graduate and former practicing attorney. In fact, MFP's principal discussed the possibility of AHN exercising the assignment provision before they purchased The Pointe. (Ex. G, Pluss Dep., p. 132, ln. 5 – p. 133, ln. 20.)

Accordingly, MFP knew at the time it purchased The Pointe that AHN had the right to assign the Lease to Dr. Reitz and Dr. Adams or any business association they formed. It accepted this risk when it purchased the property. Additionally, AHN provided MFP with notification of its intent to assign the Lease over a year before the Lease was actually assigned to LALR. It was then, for the first time, that MFP objected to the assignment provision. For MFP to now claim that AHN acted fraudulently when it exercised its previously bargained-for and openly acknowledged contractual right to assign the Lease is highly dubious. Especially when

MFP has not set forth a single fact to support its allegation that AHN acted with fraudulent intent.

2. **LALR, or in the Alternative, Dr. Reitz and Dr. Adams, is the Party Responsible for the Lease's Breach.**

At the heart of this matter is MFP's frustration with the Lease's assignment provision. In so many words, MFP is asking this Court to retroactively re-write the Lease because MFP has now, four years after the fact, decided that it does not like the assignment provision. But MFP's dissatisfaction is not grounds for the Court to rewrite an unambiguous lease that reflects the intent of the parties at the time it was drafted.

Indiana courts recognize that leases are contractual in nature and apply the law of contracts to leases. *Village Commons, LLC v. Marion County Prosecutor's Office,* 882 N.E.2d 210, 215 (Ind. Ct. App. 2008). Furthermore, it is axiomatic that courts should not unnecessarily restrict parties' freedom to contract. *Id.* at 216. This freedom to contract includes the freedom to contract improvidently. *Allison v. Union Hosp., Inc.,* 883 N.E.2d 113, 121 (Ind. Ct. App. 2008).

MFP cannot ask the Court to re-write the Lease merely because it is dissatisfied with the assignment provision. *Dick Corp. v. Geiger*, 783 N.E.2d 368, 375 (Ind. Ct. App. 2003) (holding that a court will not rewrite an unambiguous contract). MFP was well aware of the assignment provision prior to purchasing The Pointe. And as sophisticated, experienced real-estate speculators, MFP's principals were well aware of the assignment provision's potential impact on their investment. Indeed, they had even discussed the possibility of AHN exercising its right to assignment prior to purchasing The Pointe. (Ex. G, Pluss Dep., p. 132, ln. 5 – p. 133, ln. 20). For MFP to now ask the Court to bail it out of a contract it now wishes to disavow is wholly unwarranted and unsupported by Indiana law.

Thus, to the extent MFP has any claim, that claim is against LALR. In its Amended Complaint, MFP has alleged that LALR is a "shell company." (Dkt. 6, Amend. Compl., ¶ 37.) Indiana law, however, imposes no duty on a party to ensure the solvency of its assignee. *Shadeland*, 489 N.E.2d at 1192.

Indeed, *Shadeland* is instructive to the present dispute. The Meeks leased a motel to an individual, who later assigned it to Shadeland. Shadeland in turn, assigned it to a second corporation. *Id*. at 1194. The assignment released Shadeland from all liability. Following the assignment, the assignee encountered financial difficulties, vacated the premises, and breached the lease. *Id*. The lessor then filed suit against Shadeland, arguing that Shadeland breached a duty to assign the lease to a solvent corporation. The *Shadeland* court, however, refused to find an implied duty to exercise a duty of care upon assignment:

> The existence of a duty to find a solvent assignee would unduly inhibit the parties from furnishing an agreement in their own best interests.

*Shadeland*, 489 N.E.2d at 1192.

As this case demonstrates, AHN was under absolutely no obligation to determine whether LALR was solvent or to ensure that the Lease was assigned to a solvent business association.[4] To the extent any party is liable under the Lease, that party is LALR.

E.   Crime Victim Statute – Count IV of the Amended Complaint.

Similar to Count III of MFP's Amended Complaint, Count IV alleges that AHN assigned the Lease to LALR with the intent to defraud MFP. Specifically, MFP has alleged that AHN

---

[4] Not only is there no duty to ensure the financial solvency of an assignee, there is no evidence that LALR was insolvent at the time of the assignment. Both Dr. Reitz and Dr. Adams made an initial capital investment in LALR of at least $12,500 apiece. (Ex. C, Reitz Dep., p. 137, lns. 12-16; Ex. A, Adams Dep., p. 140, lns. 18-23; p. 141, lns. 7-12.) Additionally, LALR held the Sublease Agreement with AHN, which served as an additional corporate asset. This issue is irrelevant to AHN's motion for summary judgment, however, because even if LALR was undercapitalized, Indiana law provides MFP with a remedy. In the event that the corporate form has been abused to promote fraud or injustice, Indiana law permits courts to pierce the corporate veil and hold the shareholders directly liable. *Escobedo v. BHM Health Assocs., Inc.*, 818 N.E.2d 930 (Ind. 2004).

"engaged in concerted action" with LALR, Dr. Reitz, and Dr. Adams to assign the Lease to LALR with the intent to defraud MFP. MFP further alleges that by assigning the Lease to LALR, AHN violated Indiana Code § 35-43-5-4(8), which states that: "A person who with **intent** to defraud the person's creditor or purchaser, conceals, encumbers, or transfers property, commits fraud, a Class D felony." (Emphasis added).

As set forth previously, an examination of the undisputed facts reveals that this allegation is baseless. The Lease was entered into on October 24, 2000, over four years before MFP acquired its interest in the property. Section 11.02 of the Lease specifically provides AHN with the absolute right to assign the Lease to Dr. Reitz, Dr. Adams, or any business association formed by them. Furthermore, it is undisputed that MFP was aware of Section 11.02 of the Lease prior to purchasing The Pointe and that AHN kept MFP apprised of its intentions regarding assignment of the Lease at all times. (Ex. G, Pluss Dep. p. 120, ln. 23 – p. 121, ln. 11; p. 151, ln. 5 – p. 152, ln. 13.) Finally, it is clear that Dr. Reitz and Dr. Adams provided capital investment to LALR. (Ex. C, Reitz Dep., p. 137, lns. 12-16; Ex. A, Adams Dep., p. 140, lns. 18-23; p. 141, lns. 7-12.) Consequently, the undisputed facts demonstrate that AHN assigned the Lease to LALR pursuant to its long-standing business plan. It did not possess any intent to defraud MFP. Accordingly, AHN did not violate Ind. Code § 45-43-5-4(8).

F.    _Constructive Fraud – Count VII of the Amended Complaint._

In its final count, MFP alleges that AHN committed constructive fraud when it assigned the Lease to LALR and subsequently entered into the Sublease Agreement with LALR. In order to prevail on a claim for constructive fraud, the plaintiff must demonstrate (1) a duty existing by virtue of the relationship between the parties; (2) a violation of that duty by the making of material misrepresentations of past or existing facts or remaining silent when the duty to speak exists; and (3) reliance thereon by the complaining party. _Allison_, 883 N.E.2d at 123. As set

forth previously, however, the undisputed facts demonstrate that: (1) AHN did not intend to defraud MFP; (2) AHN did not commit fraud; and (3) there isn't even a possibility that AHN committed fraud. Those same facts also demonstrate that MFP cannot establish even the most basic elements of a claim for constructive fraud.

### 1. No Confidential or Fiduciary Relationship Existed between MFP and AHN.

Constructive fraud may be found only where one party takes unconscionable advantage of his dominant position in a confidential or fiduciary relationship. *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 280 (Ind. Ct. App. 2005). However, parties may not rely on a contractual relationship to create a duty that, if breached, would form the basis of a constructive fraud claim. *Allison*, 883 N.E.2d at 123.

The only relationship between AHN and MFP arose by virtue of the Lease. Thus, AHN and MFP's only relationship is contractual in nature. *See* 18 Ind. Law Encycl. Landlord & Tenant § 1 ("A Lease is a contract, and the essence of the landlord-tenant relationship is contractual in nature.") Accordingly, MFP cannot establish a relationship that meets the requirements of the first element of a claim for constructive fraud.

### 2. AHN did not Make any Material Misrepresentations.

Nor can MFP establish any material misrepresentations by AHN. In order to establish a *prima facie* constructive fraud claim, the plaintiff must show that the defendant breached its duty to the plaintiff by making deceptive material misrepresentations of past or existing facts or by remaining silent when he had a duty to speak. *Allison*, 883 N.E.2d at 123. Plaintiff, however, cannot demonstrate that AHN made any material misrepresentations regarding the assignment to LALR. The undisputed facts demonstrate that AHN negotiated for the inclusion of an absolute right to assign the Lease to Dr. Reitz and Dr. Adams, and/or any business association formed by

them, and that this right was incorporated into Section 11.02 of the Lease. The undisputed facts also show that MFP was aware of this Lease provision when it acquired its interest in The Pointe.

Moreover, AHN never represented that it would not assign the Lease or that AHN failed to inform MFP of the assignment to LALR. In fact, it is undisputed that AHN provided MFP of written notice of its intent to assign the Lease to LALR well before the actual assignment took place. AHN also provided MFP with written notice of the Sublease Agreement. Accordingly, the undisputed facts demonstrate that AHN never made any misrepresenting intentions with regard to the assignment or sublease agreements.

### 3. MFP did not Rely on any of AHN's Statements or Actions.

Finally, MFP cannot prove that it relied on any representations made by AHN. MFP was aware of all the facts surrounding the Lease prior to acquiring The Pointe. It elected to acquire The Pointe, and the Lease, on its own accord. In fact, it did so despite full knowledge that AHN could assign the Lease at any time. Moreover, AHN kept MFP apprised of its intentions regarding the Lease at all times. Accordingly, there are no facts that demonstrate that MFP relied on any action or representation made by AHN. Consequently, MFP cannot demonstrate that AHN committed constructive fraud.

### V. CONCLUSION

AHN had the absolute right to assign the Lease to Dr. Reitz and Dr. Adams or to any business association that they formed, including LALR. MFP cannot be permitted to ignore the plain language of the Lease in an attempt to extort money from AHN when AHN was simply exercising a contractual right. As such, MFP's claims against AHN for Breach of Lease, Breach of Sublease, Fraudulent Transfer and Constructive Fraud, as well as MFP's claim under the Crime Victim Statute are without merit and should be immediately dismissed with prejudice.

For the foregoing reasons, AHN respectfully requests that the Court **GRANT** its Motion for Summary Judgment.

Respectfully submitted,

ICE MILLER LLP

_/s/ Michael A. Wukmer_
Michael A. Wukmer
Eileen P. H. Moore
Michael T. McNally
One American Square, Suite 2900
Indianapolis, IN  46282-0200

Attorneys for Defendant, American Health Network
of Indiana, LLC

michael.wukmer@icemiller.com
eileen.moore@icemiller.com
michael.mcnally@icemiller.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Richard Charles Richmond, III
SOMMER BARNARD, P.C.
richmond@sommerbarnard.com

Douglas B. King
Maureen E. Ward
WOODEN & McLAUGHLIN LLP
dking@woodmaclaw.com
mward@woodmaclaw.com


  /s/ Michael A. Wukmer


ICE MILLER LLP
One American Square
Suite 3100
Indianapolis, IN  46282-0200
317-236-2100
317-236-2219 (fax)


I/2096014.10