UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MFP EAGLE HIGHLANDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:07-cv-0424-DFH-WTL |
| vs. | ) | |
| | ) | |
| AMERICAN HEALTH NETWORK | ) | |
| OF INDIANA, LLC, LALR | ) | |
| ENTERPRISES, LLC, LAWRENCE | ) | |
| A. REITZ, M.D. and LAURENCE M. | ) | |
| ADAMS, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

## I.  SUMMARY OF ARGUMENT[1]

MFP's opposition provides no obstacles to Defendants' motion for summary judgment.

Its proffered interpretation of § 11.02 of the Lease cannot be sanctioned.  Under the controlling

Indiana rules of contract construction, § 11.02 can only be interpreted to allow AHN to assign to

Reitz and Adams, individually or to a business association formed by them, including a limited

liability company like LALR.

Rules of construction and Indiana law regarding business associations show that the

phrase "business association" includes a limited liability company.  As MFP admits, "the term

'business association' is sometimes defined to include limited liability companies. . . ."

(Plaintiff's Consolidated Brief in Opposition to the Defendants' Motions for Summary Judgment

---

[1] All terms in this brief have the definitions in Defendants' Brief in Support of Motion for Summary Judgment (Defendants' "Initial Brief").

( "Opposition Brief") at 6).  As Section 11.02 reserved for AHN the right to assign the Lease to LALR, LALR is entitled to summary judgment.

Like MFP's claim of constructive fraud, which MFP abandoned (Opposition Brief at 21), MFP's claim under the Indiana Crime Victims Act ("ICVA") and its claim of tortious interference of contract are not viable.  MFP cannot prove fraud against Defendants.  Such failure is fatal to its ICVA claim.

Moreover, the evidence on which MFP relies to prove its tortious interference with contract claim includes evidence that is fatal to that claim.  The letter to which MFP points and related correspondence reveal that Defendants did not induce AHN to assign the Lease and that MFP cannot prove an absence of justification.  And, as shown in Defendants' Initial Brief, Defendants' Designation of Evidence in Support of Motion for Summary Judgment ("Designation") and in this Reply Brief in Support of Motion for Summary  Judgment ("Reply Brief"), there is no breach of contract as is required for tortious interference.

Because no claims against Defendants can survive summary judgment, there is no need to consider piercing LALR's limited liability veil.  MFP cannot satisfy the standard for piercing LALR's veil in any event.  MFP's effort to pierce the corporate veil relies only on two of the necessary elements, and the evidence related to those elements demonstrate the lack of justification for veil-piercing.

II.    **ARGUMENT**

A.    **The Unambiguous Language Of The Lease Precludes MFP From Prevailing On Any Of Its Claims Against Defendants**

MFP proffers an interpretation of § 11.02 of the Lease that does not authorize AHN's assignment of the Lease to LALR.  But, MFP's twisted interpretation fails to follow Indiana law.

When such controlling principles of contract interpretation are followed, the impropriety of MFP's proposed interpretation of § 11.02 cannot be gainsaid.

First, "construction of the terms of a written contract presents a pure issue of law." *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 173 (Ind. Ct. App. 2007) (citing *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006)). Second, "'Indiana follows 'the four corners rule' that 'extrinsic evidence is not admissible to add to, vary or explain the terms of a written instrument if the terms of the instrument are susceptible of a clear and unambiguous construction.'" *N. Ind. Public Serv. Co. v. U.S. Steel Corp.*, 881 N.E.2d 1065, 1072 (Ind. Ct. App. 2008) (*quoting Univ. of S. Ind. Found. v. Baker*, 843 N.E.2d 528, 532 (Ind. 2006) (further citation omitted)). Third, a court reads a contract "as a whole, attempting not to render any words, phrases, or terms ineffective or meaningless." *N. Ind. Public Serv. Co.*, 881 N.E.2d at 1072 (*citing Mid-States Gen. & Mech. Contracting Corp. v. Town of Goodland*, 811 N.E.2d 425, 431 (Ind. Ct. App. 2004)). Fourth, a court "'should presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions.'" *City of Lawrenceburg v. Milestone Contractors, L.P.,* 809 N.E.2d 879, 883 (Ind. Ct. App. 2004), *trans. denied*, (*quoting Indiana Gaming Co., L.P. v. Blevins*, 724 N.E.2d 274, 278 (Ind. Ct. App. 2000), *trans. denied*). Fifth, the court "must accept an interpretation that harmonizes a contract's provisions." *Id*.

MFP asserts that it is a "fact that Section 11.02 of the Lease only permits assignment of the Lease *to* Reitz and Adams *in* a business association, rather than to a business association itself. . . ." (Opposition Brief, heading ¶ 4, p. 6 (MFP's emphasis)). However, such asserted construction of § 11.02 runs afoul of the settled principles of Indiana contract law cited above for at least two reasons.

First, contrary to the principle meant to ensure the integrity of the contract, MFP's proposed interpretation of § 11.02 renders "words, phrases, or terms" of the Lease contract ineffective and meaningless. Second, MFP's interpretation contravenes the principle that seeks to harmonize all contractual provisions.

The critical language of § 11.02 is the first sentence, which states that "Tenant shall have an absolute right . . . to assign . . . to all or any subset of the following persons whether it be to them as individuals or in any business association: Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D. . . ." (Complaint, Ex. A at 18). MFP would have this Court read that sentence to mean that AHN cannot assign to a business association of which Drs. Reitz and Adams are members, but only to them, either as individuals or "**in** a business association . . . ." (Opposition Brief at 6 (MFP's emphasis)).

If this Court did so, it would be reading § 11.02 to permit AHN only to assign the Lease to Reitz and Adams as individuals. MFP's interpretation of § 11.02 is that AHN retained an absolute right to assign the Lease to Reitz and Adams "as individuals or [as individuals] in any business association . . . ." (Compl., Ex. A § 11.02.) Distilled to its essence, MFP's interpretation of § 11.02 gives AHN only the right to assign to Reitz and Adams "as individuals or as individuals." MFP's interpretation thus renders the phrase "in any business association" ineffective and meaningless, contrary to Indiana law. *See, e.g., N. Ind. Public Service Co.*, 881 N.E.2d at 1072; *Steve Silvius Ins.*, 873 N.E.2d at 174.

MFP's construction also imports discord into § 11.02 of the Lease which, if properly interpreted, is harmonious. The use of the words "whether" before "to them as individuals" and "or" before "in any business association" clearly mean that there is more than one category of possible assignees: (1) Reitz, Adams and "any future" AHN physicians as individuals, and (2) a

business association into which such individuals organize. MFP's proposed construction of § 11.02 cannot be harmonized with the structure of the sentence at issue because MFP's interpretation means that there is only one category of potential assignees: individuals. Just as MFP's proposed interpretation of the first sentence of § 11.02 would render meaningless the phrase "in any business association," so too would it render ineffective the words "whether" and "or" in the first sentence of § 11.02, contrary to the principle that all provisions should be given effect. *See, e.g., City of Lawrenceburg*, 809 N.E.2d at 833.

When properly interpreted, the first phrase, "whether it be to them as individuals," retains for AHN the right to assign to Reitz and Adams individually, and the second phrase, "or in any business association," retains for AHN the right to assign to a business association formed by Reitz and Adams. Such interpretation is the one which must control because each phrase of § 11.02 is thereby given meaning and effect and construed in harmony with the rest of the contract. *See Steve Silvius Ins*., 873 N.E.2d at 174.

Defendants' interpretation of § 11.02 is also harmonious with Indiana law defining "business association." As shown in Defendants' Initial Brief, and as MFP admits in its Opposition Brief, the lion's share of statutory and case law, as well as secondary sources, hold that the phrase "business association" includes a limited liability company. (Defendants' Initial Brief at 16-22; MFP's Opposition Brief at 6.) Indeed, the edition of Black's Law Dictionary in effect at the time AHN and The Pointe at Eagle Highlands, LLC ("The Pointe"), entered into the Lease defines "business associations" to include "limited liability companies." (Defendants' Initial Brief at 19 and Designation Exs. 1, 24.) If the phrase "business associations" did not include limited liability companies, the phrase "in any business association" in § 11.02 would be rendered meaningless, contrary to the undeniably controlling principles cited above.

Moreover, the Tenant Estoppel Letter, as rewritten by AHN's in-house counsel Kristie Hill ("Hill") (Designation Ex. 9, Dep. of Kristie Hill ("Hill Dep.") at 46-47, 55-56, 96-99; Designation Ex. 10, ¶ 2.) and as accepted by MFP's principals, underscores the clear meaning of § 11.02 as shown by Defendants that "tenant has the absolute right to assign its interest in the Lease . . . to [Dr.] Reitz and [Dr.] Adams . . . , or either of them . . . or any business association they form. . . ." (Defendants' Designation Ex. 8; Defendants' Initial Brief at 6-7). The CBRE Offering Memorandum is still more evidence of this clear meaning of § 11.02 of the Lease. (Defendants' Designation Ex. 12; Defendants' Initial Brief at 7-8, 22-23.)

Assignment of the Lease to "[Reitz and Adams] . . . in any business association" includes assignment to Reitz and Adams as managing members of LALR. To interpret § 11.02 otherwise ignores controlling contract law and creates ambiguity in an unambiguous contractual provision. Section 11.02 unambiguously reserved for AHN the right to assign the Lease to LALR. Defendants are therefore entitled to summary judgment.[2]

**B.      MFP Cannot Maintain A Claim Against Defendants Under The ICVA**

MFP bases its ICVA claim on Defendants' alleged conspiracy with AHN through which AHN assigned the Lease to LALR "with intent to defraud MFP." According to MFP, Defendants' fraudulent intent can be inferred from "certain badges of fraud." (Opposition Brief at 10, 14.) However, there is no evidence of fraudulent intent.

MFP cites *United States v. Denlinger*, 982 F.2d 233 (7th Cir. 1992), as holding that fraud can be inferred when a transferor retains the benefit and control over the property transferred. (Opposition Brief at 10.) Citing next to *United States Marketing Concepts v. Don Jacobs Buick-Subaru, Inc.*, 547 N.E.2d 892, 894 (Ind. Ct. App. 1989), MFP identifies other badges of fraud as

---

[2] As AHN points out, by arguing that AHN reassumed liability under the Lease as part of its Sublease with LALR, MFP implicitly acknowledges the validity of AHN's assignment to LALR. (AHN's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment at 11 n.1.)

"a secret or hurried transaction" and a transaction "that does not fit into the usual mode of doing business."  (Opposition Brief at 10.)

Contrary to MFP's contention, the evidence does not support an inference that Defendants conspired with AHN to defraud MFP.  First and foremost, as established in Defendants' Initial Brief and above, § 11.02 authorized AHN's assignment of the Lease to LALR, and the original landlord under the Lease, The Pointe, knew of § 11.02, as did MFP, The Pointe's eventual successor, when MFP bought the Building.  Contractual authorization in the assignment clause and MFP's knowledge of such assignment clause alone doom MFP's allegations of fraud.  In addition, the evidence here shows that MFP's reliance on *Denlinger* and *Marketing Concepts* is misplaced.

### 1.      AHN Did Not Retain Benefit And Control

In *Denlinger*, appellant had transferred ownership of certain property to a church, while continuing to occupy the property but without paying any rent.  *Denlinger*, 982 F.2d at 235.  In contrast, in conjunction with AHN's assignment of the Lease to LALR, AHN entered a Sublease Agreement for the Leased Premises, continued to occupy the Leased Premises and, thereafter, made rental payments as LALR's sublessee.  This factual scenario is wholly different from *Denlinger*, where the appellant's retention of possession, benefit and control was without corresponding cost.  AHN's continued use of the Leased Premises was the result of a contractual arrangement through which, as sublessee, AHN paid for the right to use and occupy the property.  This distinction demonstrates that AHN, **unlike** the appellant in *Denlinger*, did not retain the benefit and control over the Leased Premises without paying for it.  Such distinction shows that *Denlinger* is inapplicable and negates MFP's reliance on the "badge of fraud" cited in that case.

## 2. The Assignment Was Not Made In Secret

MFP's reliance on secrecy as a "badge of fraud" under *Marketing Concepts* is similarly flawed. For example, in an April 20, 2005, letter from AHN's counsel to MFP's principals, AHN notified MFP of the pending sublease or assignment to LALR. (AHN's Opposition to Plaintiff's Motion for Partial Summary Judgment ("AHN's Opp'n"), Ex. A.) Despite such notification, MFP refused to accept AHN's contractual right to sublease or assign the Lease to a limited liability company formed by Reitz and Adams. Rather, MFP contested the assignment and accused AHN of "perpetuating a sham." (AHN's Opp'n, Ex. I.) Nevertheless, on March 3, 2006, AHN exercised its absolute right under § 11.02 and assigned the Lease to LALR (Designation Ex. 15), notifying MFP on May 1, 2006 that the assignment had been made. (AHN's Opp'n, Ex. D; AHN's Opp'n, Ex. G; Pluss Dep. at 196, ll. 6-23.)

Such evidence shows that neither AHN nor Defendants acted surreptitiously in the assignment. MFP knew AHN intended to assign the Lease but refused to accept the clear language of § 11.02. MFP's communication with AHN regarding assignment refutes MFP's allegation that AHN and Defendants made the assignment in secrecy. By its reaction to AHN's letter of April 20, 2005, it was clear that MFP would not consent to the assignment. However, § 11.01 of the Lease precluded MFP from unreasonably withholding consent to an assignment, and AHN's assignment was reasonable because § 11.02 authorized it. (Compl., Ex. 1, § 11.01.)

In sum, there was nothing secret about AHN's assignment to LALR.

## 3. The Assignment Fits Into The Usual Mode Of Doing Business

MFP opines that because AHN and Defendants made the Assignment and Sublease retroactively effective, the contractual arrangement did not fit into the usual mode of doing business. However, MFP's opinion is nothing more than lawyer's argument; MFP cites to no law or evidence to support its argument. In the absence of evidentiary support, MFP has failed

to meet its burden to establish that making the Assignment and Sublease retroactively effective falls outside the usual mode of doing business.

### 4. There Are No Badges Of Fraud And No Claim Under The IVCA

As demonstrated above, MFP is unable to identify any applicable badges of fraud. Significantly, in *Indianapolis Indiana Aamco Dealers Advertising Pool v. Anderson*, 746 N.E.2d 383 (Ind. Ct. App. 2001), the Indiana Court of Appeals identified eight badges of fraud and held that

> [n]o single badge of fraud constitutes a showing of fraudulent intent; instead the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern from which an inference of fraudulent intent may be drawn.

*Id*. at 391.

Because MFP has not shown even one viable badge of fraud, let alone all eight, MFP cannot possibly establish a pattern from which an inference of fraudulent intent could be drawn by the trier of fact. MFP has no viable claim under the ICVA.

### C. MFP Cannot Establish Its Claim Of Tortious Interference With Contract

MFP's claim of tortious interference with contract cannot survive summary judgment. Indeed, the very evidence on which MFP relies in its attempt to construct a tortious interference claim includes evidence that undermines its claim.

To begin with, LALR has shown above that § 11.02 authorizes AHN's act of assigning the Lease to LALR. Such authorization means there is no breach of contract. Without a breach of the contract, obviously there is no tortious interference with the contract.

Additionally, MFP cannot prove that Defendants "intentionally induced" AHN to breach the Lease, which is another of the requisite elements to the claim. Significantly, the word "induce" is defined as "[t]o lead or move by persuasion or influence"; "[t]o bring about:

CAUSE." Websters II New College Dict., at 579 (3d ed. 2005). MFP asserts that LALR "proposed that AHN . . . assign the Lease to LALR." But such assertion is insufficient support for a tortious interference claim. Indiana case law establishes that a "proposal" cannot rise to the level of "inducement."

In *McLinden v. Coco*, 765 N.E.2d 606 (Ind. Ct. App. 2002), the Indiana Court of Appeals explained that in order to satisfy the inducement prong of a tortious interference claim, a plaintiff must demonstrate that the defendant was the "moving force" in the alleged breach. As a matter of law, MFP's assertion that Reitz and Adams proposed the assignment does not satisfy MFP's burden of showing that Defendants were the **moving force** in the assignment.

To support its claim of inducement, MFP relies on a September 23, 2005, letter Reitz' counsel sent to AHN's counsel. The letter, however, is evidence of nothing more than AHN and Reitz' efforts to settle their differences. (App., Ex. 20.)[3] It is clear from the letter that AHN is the entity insisting on acceptance of the Lease "either by Reitz and Adams individually or by a business association formed by Reitz and Adams." (*Id*.) The letter, in fact, proves it was not Defendants who "induced" AHN to assign the Lease to LALR. Rather, it was AHN who required such assignment as part of the settlement. (*Id*.)

This is further established in an October 20, 2005, letter from AHN's counsel to Reitz' and Adams' counsel, wherein counsel describes AHN's counteroffer for settlement: "The Eagle Highland Lease **will be assigned to an entity formed by Drs. Reitz and Adams**, effective no later than October 31, 2005." (App., Ex. 22.) As a matter of law, these are not the words of an entity "induced" by another to breach a contract.

---

[3] References to "App." are to the Appendix that MFP filed in support of its Brief in Support of Plaintiff's Partial Summary Judgment Against American Health Network of Indiana, LLC.

On October 27, 2005, counsel for Adams responded to AHN's proposal of October 20, 2005. Counsel stated: "We are comfortable **with your proposal** that the Eagle Highland's Lease be assigned to an entity formed by Drs. Reitz and Adams. We would like to effect that assignment as soon as all of the issues have been satisfactorily resolved." (App., Ex. 23 (emphasis added).) Finally, in an October 31, 2005 letter, counsel for Reitz wrote AHN's counsel informing him that "[w]e are agreeable to assignment to an entity formed by Dr. Reitz and Dr. Adams." (App., Ex. 24.) Again, as a matter of law, this language shows that Defendants did not "induce" or "persuade" AHN to assign the Lease to LALR. If either party was the "moving force" in the assignment, these letters unambiguously establish that it was AHN, *not* Defendants.

The letters of September 23, 2005, October 20, 2005, October 27, 2005, and October 31, 2005, also demonstrate that MFP cannot satisfy its burden of proving an absence of justification, another of the necessary elements for its tortious interference claim. As pointed out in Defendants' Initial Brief, and as not denied by MFP, in order to satisfy this prong of the test, MFP must show that the alleged breach was "'malicious and **exclusively** directed to the injury and damage of another.'" *Morgan Asset Holding Corp. v. CoBank*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000) (quoting *Winkler v. V.G. Reed & Sons, Inc.*, 619 N.E.2d 597, 600-01 (Ind. Ct. App. 1993) (emphasis added)). Counsels' letters described above show that AHN's assignment of the Lease was an integral part of the settlement of AHN's and Reitz and Adams' disagreements. The assignment clearly was not **exclusively** directed to the injury of MFP because it was directed to the settlement of the differences between AHN and Adams and Reitz.

As a matter of law, MFP cannot satisfy its burden for maintaining a tortious interference with contract claim against Defendants. MFP's inability to establish breach and inducement and

to show that the alleged breach exclusively was directed to MFP's injury entitles Defendants to summary judgment.

**D.    MFP's Attempt To Pierce LALR's Corporate Veil Is Without Merit**

### 1.    Veil-Piercing Is Not A Cause Of Action

 "[P]iercing the corporate veil is not a separate cause of action, but a means of imputing a corporation's liability to its shareholders." *RSR Corp. v. Avanti Dev., Inc.*, 2000 U.S. Dist. LEXIS 14210, at *40 (S.D. Ind. March 31, 2000). Because Defendants have established both in their Initial Brief and in this Reply Brief that MFP cannot succeed in its claim under the ICVA or in its claim of tortious interference with contract,[4] there is no liability to impute to LALR's members. Accordingly, there is no reason to analyze the propriety of piercing LALR's limited liability veil. In any event, no evidence justifies piercing LALR's veil.

### 2.    MFP's Challenge To Defendants' Recitation Of The Law Regarding Piercing The Corporate Veil Is Misguided

In its Opposition Brief, MFP makes much of Defendants' use of the conjunction "and" rather than "or" in their recitation of the factors a court considers when a party attempts to pierce a corporate veil. MFP's focus on Defendants' choice of words is a smoke screen to divert the Court's attention from MFP's inability to justify piercing LALR's corporate veil. Whether one uses an "and" or an "or," case law demonstrates that the result is the same.

MFP cannot dispute that Indiana courts consider all or any combination of the eight nonexclusive factors listed on page 27 of Defendants' Initial Brief to decide whether to pierce the corporate veil. The Indiana Supreme Court has held that "[a]s a general statement, the factors to be considered include whether the corporate form has been adhered to, whether corporate assets are treated as such or as personal assets, **and** whether there has been an attempt

---

[4] MFP has admitted that its constructive fraud claim fails. (Opposition Brief at 21.)

to deceive third parties." *Winkler v. Reed*, 638 N.E.2d 1228, 1232 (Ind. 1994) (emphasis added)

(citing *Hinds v. McNair*, 129 N.E.2d 553, 559 (Ind. 1955); *Lambert v. Farmers Bank*, 519

N.E.2d 745, 748 (Ind. Ct. App. 1988)).

In *Aronson v. Price*, 644 N.E.2d 864 (Ind. 1994), the Court held:

> The failure to file an assumed business name certificate is a breach of required corporate formalities. However, as noted above, it does not by itself result in the imposition of personal liability on shareholders for corporate acts. In this case it serves only as evidence that the court considers in determining whether the plaintiff has met the burden of proof in establishing misuse of the corporate form constituting a fraud or promoting injustice. None of the other factors which courts consider in deciding whether a plaintiff has met the burden of proof are present in this case. There is no contention or evidence that the business was organized or operated with capital inadequate to meet expected business liabilities. There is no contention or evidence of commingling or that the corporation paid the Prices' personal obligations. There is no contention or evidence that the Prices intended to conceal the corporate form of the business with which plaintiff was dealing, nor has plaintiff put forth any evidence of detrimental reliance. Thus the only evidence to support piercing the corporate veil present in this case is the failure to observe the corporate formality of filing an assumed business name certificate. As indicated above, such evidence alone is insufficient to impose personal liability on a shareholder. We conclude that the plaintiff here has not met his burden of proof in demonstrating misuse of the corporate form constituting a fraud or promoting injustice and that piercing the corporate veil is therefore unwarranted in this case.

*Id*. at 869.

Our Supreme Court thus made clear that **all** the relevant factors should be considered to

decide whether to pierce the corporate veil. MFP's attack on Defendants' choice of conjunctions

is much ado about nothing.

### 3. Evidence Relevant To The Two Factors On Which MFP Relies Are Insufficient Support For Piercing LALR's Corporate Veil

MFP cites no evidence in support of six of the eight factors for consideration in a veil-

piercing analysis. As shown below, the undisputed evidence as to the two elements MFP does

cite – undercapitalization and fraud – show the impropriety of piercing LALR's limited liability veil.

        a)     <u>Undercapitalization</u>

        (i)     <u>MFP's Synopsis Of The Law On Undercapitalization Is Inaccurate</u>

MFP suggests that because courts list undercapitalization first in their analysis of piercing the corporate veil, it is more important than the other factors. MFP attempts to distort the legal significance accorded undercapitalization because it has no evidence to offer on the other factors. MFP's legal analysis is simply wrong.

MFP quotes Brodsky, "Law of Corporate Officers and Directors: Rights, Duties and Liabilities," stating that undercapitalization is "an extremely significant factor in determining whether to pierce the corporate veil." (Opposition Brief at 17.) However, an examination of the Brodsky treatise reveals that the passages MFP has selectively quoted are not indicative of the thrust of the treatise. For example, MFP fails to mention that Brodsky qualifies his statement that undercapitalization is extremely significant by explaining that it "is more important in tort, as opposed to contract cases," relegating undercapitalization just to "one of the factors to be considered in contract cases." Brodsky, Law of Corporate Officers and Directors: Rights, Duties and Liabilities § 20:7 (2007). Brodsky reasons that "[t]he primary significance of undercapitalization in tort cases stems from the unfairness of permitting an inadequately capitalized corporation engaged in a risky business to shift the risk of loss to innocent members of the general public." *Id*.

Brodsky's analysis of undercapitalization is inapplicable to the facts of this case. First, this case rests on MFP's breach of contract claim. MFP's other claims arise from its contention

that AHN breached the Lease when AHN assigned it to LALR. When § 11.02 is properly interpreted, there is no breach, no fraud and no viable tort claims.

Even if this case truly were a tort case, it obviously is not the type of tort case to which Brodsky refers. Brodsky's explanation of the significance of undercapitalization in tort cases establishes the irrelevance of this concept here. In particular, Brodsky notes that courts find it unfair to permit a corporation "to shift the risk of loss to innocent members of the general public." Brodsky, Law of Corporate Officers and Directors: Rights, Duties and Liabilities § 20:7 (2007). These innocent members of the general public are people who, for example, suffer physical injury at the hands of the undercapitalized corporation. In stark contrast to these "innocent people" are the members of MFP. As demonstrated in Defendants' Initial Brief, MFP's members are sophisticated businessmen who, when they purchased the Building, were well aware of AHN's right to assign it to a business association such as LALR.

As explained in Defendants' Initial Brief, and as not denied by MFP, the Tenant Estoppel Letter clearly notified HNB, Forty-One and MFP's predecessors, ASM, DSF and PS, of AHN's absolute right to assign the Lease to Reitz and Adams **or** to a business association they form. As shown in Defendant's Initial Brief (at 6-7), and as not denied by MFP, all three principals of MFP (Miller, Frishman and Pluss) and two of their lawyers had the Tenant Estoppel Letter confirming AHN's right to assign the Lease to a business association like LALR **before** they bought the Building and accepted the Lease. (Designation Ex. 1, Pluss Dep. at 234-35.)

Moreover, the precise language of § 11.02 was included in the CBRE Offering Memorandum, which CBRE prepared as a realtor trying to sell the Building for Forty-One. (Designation Ex. 12; Designation Ex. 1, Pluss Dep. at 120-21.) Pluss testified that he received and read the Offering Memorandum before ASM, DSF and PS purchased the Building and

assumed The Pointe's rights and obligations under the Lease. (Designation Ex. 1, Pluss Dep. at 120-21.)

Such evidence shows the impropriety of MFP's reliance on Brodsky's treatise. MFP's members, who are savvy investors (Defendants' Initial Brief at 4-5), bought the Building and assumed the Lease with **full knowledge** that AHN retained the right to assign it to an entity such as LALR. MFP's members are hardly "**innocent** members of the public." Brodsky, Law of Corporate Officers and Directors: Rights, Duties and Liabilities § 20:7 (2007) (emphasis added).

Furthermore, MFP's argument that the element of undercapitalization has greater significance than other elements is not supported by the law. For example, legal scholars state that inadequate capitalization is **not** "in itself, sufficient to support a disregard of the corporate entity. That a corporation is undercapitalized is one factor in resolving the corporate entity issue." 18 Am. Jur. 2d Corporations § 56 (2d ed. 2008). In an article on piercing the corporate veil, Stephen B. Presser states that "inadequate capitalization by itself' 'very rarely if at all' leads to the subjection of shareholders to personal liability for corporate debts . . . ." Stephen B. Presser, Piercing the Corporate Veil § 1:9.

Moreover, Defendants have located no case, let alone an Indiana case, suggesting that inadequate capitalization, without more, provides a basis for piercing the corporate veil. Even in *Temple v. Bodega Bay Fishers, Inc.* 180 Cal. App. 2d 279 (1960), which MFP cites, the Court did not pierce solely on the basis of undercapitalization. In sum, MFP misstates the law on undercapitalization.

(ii)    <u>LALR Was Not Undercapitalized</u>

In any event, Reitz and Adams did not undercapitalize LALR, which was formed in accordance with § 11.02 to accept assignment of the Lease. Not only did Reitz and Adams

capitalize LALR with AHN's sublease of the Leased Premises, but also they each made a $12,500 cash contribution to LALR, for a total $25,000.[5]

MFP makes light of Defendants' cash contribution, comparing it to the total amount of rent due over the course of the six years that remained on the Lease at the time of its assignment. However, the amount of cash contributed must be considered in context. When LALR was formed, Reitz and Adams knew that AHN had agreed to sublease the Leased Premises from LALR for at least the first year. Consequently, the rental amount due on the Lease is not relevant because LALR and its principals Reitz and Adams knew that AHN was going to pay that rent to MFP. LALR, which had no employees or ongoing costs, only had to focus on finding tenants if AHN terminated the Lease before the end of the term of the Lease.

MFP suggests that Defendants knew they would not be able to find a replacement subtenant for AHN because were aware that The Pointe's inability to find tenants for the Building led to it giving HNB a deed in lieu of foreclosure. (Opposition Brief at 19.) However, The Pointe's alleged difficulty in locating tenants does not necessarily mean that LALR would have that problem. Even if The Pointe was unsuccessful in leasing space, its lack of success could have been a result of The Pointe's marketing strategy or of the rental market at that particular time. The Pointe's leasing problem, as MFP identifies it, could have been the result of any number of things, none of which suggest that LALR knew it would be unable to lease space twelve or more months in the future.

---

[5] MFP's suggestion that Reitz' and Adams' cash contributions do not count because they tendered them a couple of months after LALR was formed relies on an inaccurate interpretation of case law. In *Community Care Centers, Inc. v. Hamilton*, 774 N.E.2d 559 (Ind. Ct. App. 2002), cited by MFP, the Court did state that the adequacy of capital "is to be measured as of the time of a corporation's formation." *Id.* at 565. However, an examination of the entire passage in which such statement is made shows that the court's statement was not meant to discount any capital infusion unless it was made on or before the date of formation. Rather, the Court's statement means that if the *initial* capital is adequate, it will not be deemed inadequate if it later suffers financial reverses.

Interestingly, MFP suggests that LALR knew it could not sublease the Building when it accepted the assignment from AHN in 2006. Yet, ASM, DSF and PS bought the Building in November 2004, **after** HNB had taken the Building from the Pointe by a deed in lieu of foreclosure in 2003. (Designation Ex. 1, Pluss Dep. at 256.) If MFP's contention is that the Building was, in effect, un-leasable, then ASM, DSF and PS purchased the Building knowing that they would not be able to lease out space in it. It seems more likely that when ASM, DSF and PS bought the Building in 2004 they thought that they could find additional tenants for the Building even though The Pointe had been unable to do so a year or so earlier. Similarly, after a year on AHN's 2006 Sublease, when AHN terminated its Sublease in 2007, LALR thought that it could locate other sublessees for the Leased Premises. LALR's eventual inability to locate a sublessee does not show that it was undercapitalized.

MFP asserts that AHN's sublease of the Leased Premises does not count as capitalization because LALR got nothing from the Sublease "other than a one-year postponement" of rent payments. (Opposition Brief at 18.) Contrary to MFP's assertion, the Sublease was an asset. Because of the Sublease, rent payments on the Leased Premises were satisfied for at least one year and Defendants knew that AHN would be its sublessee for at least one year. If, during the term of AHN's Sublease, LALR had landed a new tenant, the "one-year postponement" that MFP now disparages would have been critical. The adequacy of LALR's capitalization must be judged at the time when LALR was formed, not in hindsight.

In sum, undercapitalization is but one of the factors considered in a veil piercing analysis. Rarely, if ever, is it sole support for a decision to pierce the corporate veil. More importantly, LALR was not undercapitalized. Reitz and Adams infused LALR both with cash contributions and with the Sublease.

b) <u>LALR Was Formed In Accordance With The Lease And Was Not Used To Promote Fraud Or Injustice</u>

The second and only other factor in the veil piercing test that MFP contends is applicable in this case is the factor under which a court considers whether the corporation was used to promote fraud, injustice or illegal activities. According to MFP, AHN's assignment of the Lease was fraudulent.

MFP's argument ignores the fact that, as shown above and in Defendants' Initial Brief, § 11.02 authorized AHN to assign the Lease to a business association like LALR. MFP's allegations of fraud also ignore the fact that MFP's members knew or should have known when they purchased the Building, based on the Lease itself, the Tenant Estoppel Letter and the CBRE Offering Memorandum, that AHN retained the absolute right to assign the Lease to a business association. These overriding facts rebut MFP's attempt to pierce LALR's corporate veil.

III. **CONCLUSION**

AHN's assignment of the Lease to LALR was authorized by § 11.02. That contractual authorization alone precludes MFP's claim under the ICVA and its claim of tortious interference. MFP's ICVA claim also fails because MFP cannot establish fraudulent intent. MFP's tortious interference claim fails because there is no breach, because Defendants did not induce AHN to assign the Lease to LALR, and because AHN cannot prove an absence of justification. Because there is no viable claim against Defendants, there is no need to consider piercing LALR's limited liability veil. Even if the Court considered veil-piercing, the undisputed evidence, considered under the law as correctly described above rather than under MFP's incorrect summary of the law, demonstrates the impropriety of invoking such an equitable remedy. Defendants are therefore entitled to summary judgment.

Respectfully submitted,


/s/ Douglas B. King
Douglas B. King, #5199-49


/s/ Maureen E. Ward
Maureen E. Ward, #17121-49

Attorneys for Defendants LALR Enterprises, LLC,
Lawrence A. Reitz, M.D. and Laurence M. Adams,
M.D. ("Defendants")

WOODEN & McLAUGHLIN LLP
211 North Pennsylvania Street
One Indiana Square, Suite 1800
Indianapolis, IN 46204-4208
Tel:      (317) 639-6151
Fax:      (317) 639-6444

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2008, a copy of the foregoing *Defendants' Response Brief in Support of Motion for Summary Judgment* was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Richard C. Richmond, III　　　　　　　　Michael T. McNally
TAFT STETTINIUS & HOLLISTER LLP　　Eileen P. H. Moore
rrichmond@taftlaw.com　　　　　　　　　ICE MILLER
　　　　　　　　　　　　　　　　　　　mcnally@icemiller.com
　　　　　　　　　　　　　　　　　　　eileen.moore@icemiller.com


　　　　　　　　　　　　　　/s/ Maureen E. Ward
　　　　　　　　　　　　　　Maureen E. Ward