UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MFP EAGLE HIGHLANDS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN HEALTH NETWORK | ) | CASE NO. 1:07-cv-0424-DFH-WGH |
| OF INDIANA, LLC, | ) | |
| LALR ENTERPRISES, LLC, | ) | |
| LAWRENCE A. REITZ, M.D.., and | ) | |
| LAURENCE M. ADAMS, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

In this acronym-rich case, an unsuccessful health care center development
has left plaintiff MFP Eagle Highlands, LLC ("MFP") as the owner of a medical
office building it cannot lease.   Plaintiff MFP has sued the original tenant,
American Health Network of Indiana, LLC ("AHN"), as well as LALR Enterprises,
LLC, which was the assignee of the AHN lease, and the two principals of LALR, Dr.
Lawrence Reitz and Dr. Laurence Adams.   Against AHN, plaintiff asserts claims
for breach of contract, fraudulent transfer, constructive fraud, and for civil relief
under an Indiana statute granting remedies to victims of crime.   Against LALR, Dr.
Reitz, and Dr. Adams, plaintiff has sued for tortious interference with contract,
constructive fraud, and for civil relief for crime victims.   MFP also seeks to pierce
the corporate (actually, the limited liability company) veil to hold Dr. Reitz and Dr.

Adams personally responsible for LALR's lease obligations.   Defendants have moved for summary judgment on all claims.   Plaintiff MFP has moved for partial summary judgment on its claim for breach of the sublease against AHN.

This court has diversity jurisdiction under 28 U.S.C. §1332.   Plaintiff MFP is a Colorado limited liability company whose members are all citizens of Colorado. See *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998) (for purposes of diversity jurisdiction, limited liability company is treated like a partnership and takes on the citizenships of all members).   AHN and LALR are both Indiana limited liability companies with no members who are also citizens of Colorado.   Dr. Reitz and Dr. Adams are both citizens of Indiana.

As explained below, the contracts in question unambiguously gave AHN the to assign the lease to LALR and then to sublease the space for one year from LALR.   Summary judgment is granted for AHN on all claims against it and denied for MFP on its claim for breach of the sublease except for one month's rent.   In addition, the contracts clearly gave the defendants the right to shift the lease obligations around as they did, and there is no basis for holding Dr. Reitz or Dr. Adams personally liable on the lease or under any other theory.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving parties must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving parties on the evidence presented. *Id.*

In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or choose from among different reasonable inferences that might be drawn from the evidence. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (reversing summary judgment); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (reversing summary judgment). The court must view the evidence in the light reasonably most favorable to the non-moving parties, giving them the benefit of conflicts in the evidence and the most favorable reasonable inferences. *Paz*, 464 F.3d at 664; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006).

"Where there are no genuine issues of material fact, contract interpretation is particularly well-suited for summary judgment." *Allstate Ins. Co. v. Tozer*, 392 F.3d 950, 952 (7th Cir. 2004) (reversing and directing summary judgment in favor of plaintiff on issue of Indiana contract law).  Where a contract is ambiguous as applied to the circumstances shown by the evidence, however, summary judgment may be difficult to support.  In such a case, the parties may try to clarify the ambiguity by presenting extrinsic evidence of the objective manifestations of their intentions.   See *University of Southern Indiana Foundation v. Baker*, 843 N.E.2d 528, 535 (Ind. 2006) (abandoning distinction between patent and latent ambiguities).   The fact that the parties have filed cross-motions for summary judgment does not affect the analysis.   When considering the defendants' motions, the court must consider the evidence in the light reasonably most favorable to plaintiff MFP.  When considering MFP's motion for summary judgment, the court must consider the evidence in the light reasonably most favorable to defendants.  Many of the material facts, however, are undisputed, such as the terms of the relevant contracts.

### *Relevant Facts*

Dr. Reitz and Dr. Adams were members of AHN, a group of affiliated physicians.  In 2000, they invested in The Pointe at Eagle Highlands, a new development of medical office space in Indianapolis.  They also, through AHN, leased space in the building, originally signing a lease on October 24, 2000.  The

building was completed in 2002.  AHN, in the persons of Dr. Reitz and Dr. Adams, moved into the premises in May 2002 and signed an amended lease dated June 1, 2002.  The long-term lease included a term that gave AHN the "absolute right" to assign its lease to Dr. Reitz and/or Dr. Adams "as individuals or in any business association."  Lease § 11.02.

From the beginning, The Pointe has struggled to attract tenants.  It has had a number of different owners.  In March 2003, the owner defaulted on a construction loan from Huntington Bank.  The owner gave a deed in lieu of foreclosure and assigned the lease to a Huntington affiliate, Forty-One Corporation.  Dkt. 61, Ex. 2-3.  In November 2004, Forty-One Corporation sold the building and assigned AHN's lease to a company called Polo Run.  In May 2005, Polo Run deeded the building and assigned the lease to MFP, a limited liability company that includes the same three primary investors as Polo Run.[1]

In the course of negotiations to buy The Pointe, Polo Run received a Tenant Estoppel Letter in November 2004 that included the provision of AHN's lease allowing it to assign the property to Dr. Reitz and/or Dr. Adams or to a business association they might form.  Dkt. 60, Ex. K.  Thus, Polo Run entered into the agreement with Forty-One Corporation with full knowledge of AHN's rights under the contract.  At least two members of Polo Run/MFP discussed the possibility of

---

[1]The entire ownership structure of MFP is complicated, see Dkt. 11, ¶1, but it basically consists of a series of business organizations created individually by three investors:  Andrew S. Miller, David S. Frishman, and Douglass A. Pluss.

losing AHN due to its right to assign the lease.  Pluss Dep., Dkt. 65, Ex. D, at 132-33.   After taking over the property in 2004, Polo Run and then MFP were successful in adding only one tenant to The Pointe, in addition to AHN and LALR. *Id.* at 90.

In 2005, AHN began to have difficulties with both Dr. Reitz and Dr. Adams.  AHN's other doctors believed these two were operating at a deficit.   AHN considered assigning some portion of or perhaps the entire lease to a limited liability company formed by Dr. Reitz and Dr. Adams and informed Polo Run of the possibility in April 2005.  Dkt. 11, Ex. B.  AHN asked Polo Run if it would prefer simply to terminate the lease.  Polo Run disputed the possibility that AHN could assign the lease to what it termed a "shell company."  Dkt. 11, Ex. C.  AHN responded that it did not agree with Polo Run's position.   Dkt. 11, Ex. D.

Meanwhile, negotiations between the two doctors and AHN were ongoing.  The parties first began a dispute near the end of 2004, when AHN claimed that the doctors owed it over $400,000.  This accusation caused consternation for Dr. Reitz, who left AHN in early 2005.  Dr. Reitz effectively retired after returning from a vacation in late 2004 to find limitations placed on his practice.  He claims that after he returned, he was no longer reimbursed for the patients he saw.   He became "acutely depressed" and stopped practicing.  Reitz Dep., Dkt. 61, Ex. 14, at 102-07.  In addition to the negotiations over the deficit allegedly owed by Dr. Reitz and Dr. Adams, at least Dr. Reitz disputed the amount of equity he had in

AHN.  *Id.* at 112-13.  As a result of Dr. Reitz ceasing to practice, AHN entered negotiations with Dr. Reitz and Dr. Adams to assign the lease to them.  These parties had agreed to a conditional assignment back in 2000, whereby AHN could assign the lease to them if either doctor's relationship with AHN ended.  Dr. Reitz and Dr. Adams contended that this contract was not enforceable.  When negotiations stalled, AHN notified Dr. Reitz and Dr. Adams on July 25, 2005 that it was assigning the lease to them in sixty days pursuant to AHN's understanding of the conditional assignment.  Dkt. 61, Ex. 18.  On September 23, 2005, Dr. Reitz's attorney made a final effort to set up a meeting among the parties "to hammer out a settlement acceptable to all concerned that will avoid a 'war' on all fronts and will expose everyone's flanks to the current landlord under the Lease." Dkt. 61, Ex. 20.  On October 5, 2005, Dr. Adams' attorney proposed assigning the lease to Dr. Reitz and Dr. Adams in a limited liability company and then subleasing the premises back to AHN.  Dkt. 61, Ex. 21.  The parties sorted out the details over the next five months and agreed to an assignment to LALR and sublease back to AHN for one year in March 2006.  LALR was not officially formed until March 3, 2006, the effective date for the series of transactions.

The details were not finalized until May, but upon completion of the assignment, AHN informed MFP that it had assigned the lease to LALR effective March 3, 2006.  Dkt. 11, Ex. E.  March 3, 2006 also became the effective date of the sublease from AHN back to LALR.  At that time, LALR had no capital, and its only asset was the sublease.  In May 2006, both Reitz and Adams paid $12,500

to LALR, giving it a total cash capitalization of $25,000.  LALR has complied with all state reporting requirements since its formation as a limited liability company.

The notice that the lease had been assigned to LALR led to a series of communications between the parties. Dkt. 11, Exs. E – N.  MFP did not agree that AHN had the right to assign its lease to LALR.  Eventually MFP said it would allow the transfer under the general transfer provision of the lease, which required that the subtenant (AHN) assumed all obligations under the Lease.  Dkt. 11, Ex. L. AHN rejected this possibility and claimed that it would leave the premises if MFP did not consent to the transfer and stated that it would never agree to be "jointly and severally liable" with LALR for the lease.  Dkt. 11, Ex. M.  On June 5, 2006, the final word from MFP claimed that it did not accept the assignment and considered AHN still the tenant under the lease.  Dkt. 11, Ex. N.  Throughout this entire period, per the terms of the sublease between AHN and LALR, AHN paid rent directly to MFP.  When the rent came due on March 1, 2007, however, AHN did not pay.  A representative for Dr. Reitz contacted MFP to say that AHN was moving out.  Since that date, MFP has received no further rent from either LALR or AHN.

While subleasing to AHN, LALR attempted but was unable to find a tenant to replace AHN.  LALR unsuccessfully attempted to lease the premises by hiring a listing agent and advertising the available space.  LALR's lack of success renting the space is not unusual, since The Pointe had contracted with only one tenant

besides AHN.  Unable to find a subtenant, LALR paid no rent after AHN left.  MFP
then filed this suit.  Additional facts are noted below as needed, keeping in mind
the applicable standard for summary judgment.

*The Right to Assign the Lease*

The best starting point is to consider whether AHN had the right to assign
the lease to LALR.  The unambiguous language in the underlying lease of the
space from the building owner to AHN allows such an assignment, regardless of
the capitalization or resources of the assignee.  The relevant contract terms in the
parties' lease are found in Article 11:

ARTICLE 11
Assignment and Subletting

*Section 11.01. Assignment and Subletting by Tenant*.  Tenant may not
assign the Lease or sublet the Leased Premises or any part thereof, without
the prior written consent of Landlord, which consent shall not be
unreasonably withheld; and any attempted assignment or subletting
without such consent shall be invalid.   In the event of a permitted
assignment or subletting, Tenant shall nevertheless at all times remain fully
responsible and liable for payment of rent and the performance and
observance of all of Tenant's other obligations under the terms, conditions
and covenants of this Lease.  No assignment or subletting of the Leased
Premises or any part thereof shall be binding upon Landlord unless such
assignee or subtenant shall deliver to Landlord an instrument (in recordable
form, if requested) containing an agreement of assumption of all Tenant's
obligations under this Lease.  Upon the occurrence of an event of default,
if all or any part of the Leased Premises are then assigned or sublet,
Landlord, in addition to any other remedies provided by this Leased or by
law, may, at its option, collect directly from the assignee or subtenant all
rent becoming due to Landlord by reason of the assignment or subletting.
Any collection by Landlord from the assignee or subtenant shall not be
construed to constitute a waiver or release of Tenant from the further

-9-

performance of its obligations under this Lease or the making of a new lease with such assignee or subtenant . . . .

*Section 11.02. Assignment to Eagle Highlands Physicians.* Notwithstanding any provision above, Tenant shall have an *absolute right* during any term, option period, extension or renewal of this Office Lease to assign or sublease *to all or any subset of the following persons whether it be to them as individuals or in any business association*: Lawrence A. Reitz, M.D. and Laurence M. Adams, M.D. and any future American Health Network Eagle Highland Physicians (all hereinafter referred to as "Eagle Highlands Physicians") from Landlord. And further notwithstanding any provision above, *Landlord agrees that the assignment or sublease to Eagle Highlands Physicians will result in Landlord immediately releasing Tenant from all liability under this Office Lease.* (Emphasis added.)

The plain text of Section 11.02 – with the "absolute right" to assign or sublease to Dr. Reitze and/or Dr. Adams or "any" business association they might form – demonstrates that AHN was within its rights to assign the lease to the limited liability company that Dr. Reitz and Dr. Adams created.

MFP disagrees based on a strained reading of the phrase "business association." It argues that the lease needed to be assigned to Dr. Reitz or Dr. Adams personally, "in" a business association. This argument is not compelling in light of the unambiguous text of the lease provision. A limited liability company is generally considered a business association. Black's Law Dictionary has an entry for "business association" that refers the reader to "business enterprise," which is defined as: "The field of law dealing with various forms of business, such as corporations, limited-liability companies, and partnerships." Black's Law Dictionary 157 (8th ed. 2004). MFP does not dispute that business association generally includes a limited liability company, but it argues that the language

calling for an assignment to Dr. Reitz or Dr. Adams "in" a business association requires a different reading of the term.  Turning to the same source that defines business association to include a limited liability company, MFP argues that "association" must be limited here to "an unincorporated organization that is not a legal entity separate from the persons who compose it."  See Black's Law Dictionary 132 (8th ed. 2004).  Even though Black's Law Dictionary defines "business association" as defendants suggest, plaintiff MFP relies on this definition of the separate term "association" in the same dictionary.

To highlight the supposed ambiguity of the term "business association," MFP turns to the Indiana Code.  AHN points out sections of the code that define a "business association" to include a limited liability company.  See, *e.g.*, Ind. Code § 32-34-1-5  (defining "business association" to include a "limited liability company").   MFP acknowledges this definition but also finds sections where limited liability companies are included in definitions that also list "business association" as a different entity.  See, *e.g.*, Ind. Code § 13-11-2-8 (defining "Applicant" as an "individual, a corporation, a limited liability company, a partnership, or a business association that applies for an original permit for the construction or operation of a landfill).

Whatever merit MFP's argument about distinctions between a limited liability company and a business association might have in other contexts, it must fail with regard to the lease in this case.  MFP's definition of "business association"

-11-

renders the phrase effectively meaningless in the lease.   If the business association has no corporate form, then an assignment to Dr. Reitz and/or Dr. Adams in a business association would be no different from an assignment to Dr. Reitz and/or Dr. Adams as individuals.  Yet section 11.02 specifically allowed MFP to assign the lease "to all or any subset of the following persons," which meant it could assign the lease to Dr. Reitz and Dr. Adams at the same time.  The language cited by MFP in the Indiana Code, meanwhile, could refer to business associations that had no official corporate form but were still responsible under those environmental and other Indiana laws.   Absent any sort of corporate form, however, the business association envisioned by MFP would effectively be just a named entity that still held Dr. Reitz and Dr. Adams personally responsible for the entity's debts.  Therefore, the use of "business association" under MFP's proffered reading is extraneous.  Under Indiana law, contracts will not be read to "render any words, phrases, or terms ineffective or meaningless." *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 213 (Ind. App. 2007).

### *Claims for Fraudulent Transfer and Violations of the Crime Victim Statute*

As a matter of law, AHN had the absolute right to transfer the lease to LALR.  MFP's claims of fraudulent transfer and violation of the Crime Victim Statute, Ind. Code § 35-43-5-4(8), must therefore be dismissed.   Quite simply, AHN was completely within its contractual rights to transfer the lease to LALR, so it was not violating other legal duties in doing so.  Most important, even if LALR were not a

"legitimate" company, AHN had no specific duty to assign the lease to a viable company. "How and to whom a leasehold may be assigned is a matter for contract law to be decided by the landlord and tenant each bargaining in his own interest. The existence of a duty to find a solvent assignee would unduly inhibit the parties from fashioning an agreement in their own best interest." *Shadeland Development Corp. v. Meek*, 489 N.E.2d 1192, 1200 (Ind. App. 1986) (reversing summary judgment for lessor and remanding for entry of summary judgment in favor of lessee who assigned lease to assignee who had defaulted).

Here, the lease gave AHN the "absolute right" to assign the lease to Dr. Reitz and/or Dr. Adams or any business association they might form.  AHN satisfied the conditions of the contract, and *Shadeland Development* shows that, absent an explicit contractual limit, the solvency or capitalization of LALR cannot be used as a restraint on AHN's right of assignment. See *id.* at 1195-96 (holding that lease gave lessee right to assign to other entity without needing to assure solvency of the assignee).  AHN negotiated for just such a possibility in the contract and also contracted with Dr. Reitz and Dr. Adams to allow a transfer of the lease.  All parties involved knew that AHN had the right to make an assignment like this when they agreed to the relevant contracts.

MFP argues that *Shadeland Development* is distinguishable because the facts of that case included security for the damaged party.  This reading of the case is not persuasive.  The Indiana Court of Appeals did note:  "Because of this

security, it is not unreasonable for the parties to place no duty on Shadeland to choose a particular assignee." *Id.* at 1201.  MFP is incorrect about the meaning of the court's point.  The court was attempting at that point of the opinion to explain why the lease contract did not restrict the assignment of the contract.  The key point in the case was that the court declined to find an implied duty in the lease for the lessee to assign the lease to a party that would be financially capable of paying the long-term lease obligations.  The language and authority cited by MFP supported the Court of Appeals' reading that no such limitation was in the contract.  The security merely made the court's reading of the contract more reasonable.

The central logic of *Shadeland Development* is that any restrictions on the right to assign a lease must be contractual.  The lease in this case gave AHN the "absolute right" to assign the lease to Dr. Reitz and/or Dr. Adams, either individually or in "any" business association.  The lease was entered into by knowledgeable professionals and assumed by the sophisticated investors of MFP. A reasonable trier of fact could not find an implied limit on the right to assign the lease where the lease specifically states that no such limit exists.

Given AHN's contractual right to assign the lease to LALR, AHN cannot be held liable on any claim that depends on the assignment having been invalid. MFP's claim under the crime victims' statute alleges "concerted action" to defraud MFP.  Since AHN was merely exercising its legal rights under its contract with

MFP, it could not have been engaged in a criminal scheme to defraud MFP. By exercising its assignment rights under Section 11.02 of the lease, AHN was released from all liability under the lease with MFP. MFP's claims against AHN for fraudulent transfer and under the crime victim statute must be dismissed.[2]

*MFP's Claim against AHN for Breach of the Sublease*

MFP argues next that even if AHN was entitled to assign the lease to LALR and walk away from the property, AHN agreed to take obligations back upon itself when it agreed to sublease the property back from LALR after assigning the original lease. Both sides have moved for summary judgment on this issue. No disputed facts are relevant to its determination, so summary judgment is appropriate.

AHN signed a sublease agreement with LALR effective March 3, 2006 that lasted for one year. Under the terms of the sublease, AHN agreed to "expressly assume and agree to perform and comply with . . . each and every obligation of Sublessor as Tenant under the Lease." Dkt. 65, Ex. J, § 7. The lease that AHN transferred to LALR provides subletting only with the prior written consent of the Landlord, which could not be unreasonably withheld. Lease, § 11.01. MFP sent a letter to AHN that it would need to deliver an instrument containing an

---

[2]As a result, MFP's claim for tortious interference with contractual relations against LALR and Dr. Reitz and Dr. Adams must also be dismissed. That cause of action requires a breach of the contract, and here no contract was breached. In briefing, MFP withdrew its claim for constructive fraud.

agreement to assume all of LALR's obligations under the lease.  Dkt. 11, Ex. L. This step was never taken by AHN.

Based on this failure, MFP argues that the sublease was invalid.  How would that conclusion help MFP?  MFP does not propose to refund the money that AHN paid directly to MFP under the sublease and then to pursue a claim against only LALR.  Instead, MFP argues that AHN's failure to comply with that condition means that AHN became fully liable again for all obligations for the full term of the original lease.  MFP bases this theory on a tenet of contract law that "a party may not accept benefits under a transaction or instrument and at the same time repudiate its obligations."  *E.g.*, *Matter of Estate of Palamara*, 513 N.E.2d 1223, 1228 (Ind. App. 1987).  According to MFP, when it laid out the condition that AHN assume the lease before allowing LALR to sublease to AHN, it set the terms for any subsequent sublease.  According to MFP, AHN's decision to stay at The Pointe and to receive those benefits means that AHN should be deemed to have agreed to assume all of LALR's obligations under the Lease.  In fact, MFP goes so far as to argue that it is still entitled to consider AHN the tenant of the lease.  Dkt. 11, Ex. L.

This theory is not legally sound for several reasons.  First, as stated above, the assignment to LALR was proper, so the newly formed limited liability company became MFP's tenant, releasing AHN from liability under the original lease.  Second, the proper mechanism for dealing with an undesired assignment was to

pursue remedies against the tenant, not the sublessee.  If LALR and AHN went forward with a sublease without MFP's consent, MFP had a contractual right against LALR, not against AHN.  AHN agreed to accept all conditions of the lease during the term of the sublease.  With the exception of the March 2007 payment, MFP does not dispute that AHN properly followed the lease during the one year term of its sublease from LALR.  Leaving aside whether MFP reasonably withheld its consent for a sublease, it was not entitled to deny the sublease and then to impose extra-contractual terms against the sublessee or to treat the sublessee as the permanent tenant when the contract had been properly assigned to its new tenant, LALR.

The issue of the March 2007 rent is a different problem.  MFP argues that, at a minimum, it is entitled to the full payment for March.  According to MFP, AHN assumed full responsibility for the lease under the terms of the sublease, and a full month's rent was due on March 1st.  AHN did not vacate the premises until March 3rd.  Under the terms of the sublease, AHN was responsible for paying rent "on or before the 1st Day of each succeeding calendar month, Sublessee hereby agrees to pay directly to Prime Landlord, in advance, Basic Annual Rent. . . ." Dkt. 65, Ex. J, § 3.  AHN's sublease ran only through March 3rd, but it was still governed by this sublease on March 1st.  Although AHN was responsible to MFP only through March 3, 2007, it had contracted with LALR to pay the whole rent for March 2007.  Accordingly, AHN is responsible to MFP for a month's rent in March.  In other words, the court grants MFP's motion for summary judgment to

the extent that AHN is obligated to pay that one month's rent to MFP, and denies MFP's motion on this claim in all other respects.  Similarly, the court grants AHN's motion for summary judgment on this claim except with respect to the March 2007 rent.

MFP's Effort to Pierce the "Corporate" Veil of LALR

MFP maintains that even if the assignment of lease to LALR was valid, MFP should still be entitled to pierce the veil of limited liability to hold Dr. Reitz and Dr. Adams personally responsible for the unpaid lease term.  Although LALR is a limited liability company and not a corporation, it makes sense to address the issue in terms of piercing the proverbial corporate veil.  The same standards apply equally to corporations and to limited liability companies.  *Troutwine Estates Development Co. v. Comsub Design and Engineering, Inc.*, 854 N.E.2d 890, 899 (Ind. App. 2006).

The burden is heavy for a plaintiff attempting to pierce the corporate veil, requiring proof "that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuses of the corporate form would constitute a fraud or promote injustice."  *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994).  Indiana law instructs a court to consider eight factors in determining whether to pierce the corporate veil.  They are:  (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation

-18-

by corporate shareholders or directors; (4) use of corporation to promote fraud, injustice, or illegal activities; (5) payment by corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.  *Id*; *Escobedo v. BMH Health Associates, Inc.*, 818 N.E.2d 930, 933 (Ind. 2004).  The *Aronson* factors are "non-exhaustive factors that may be considered in determining whether to pierce the corporate veil.  There does not necessarily need to be evidence of every *Aronson* factor in order to support piercing the corporate veil." *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 506 (Ind. App. 2007).[3]

The undisputed factors show that six of these factors weigh against piercing the corporate veil.  LALR observed the legal formalities of a limited liability company and kept appropriate records.  There is no evidence that the company paid personal obligations of its principals or that assets and affairs were commingled.  There is no evidence that anyone represented to MFP or anyone else that LALR was anything other than a limited liability company or that any member ignored or manipulated the limited liability form.

---

[3]The LALR defendants point out correctly that "piercing the veil" is not in and of itself a cause of action.  See *RSR Corp. v. Avanti Devel., Inc.*, 2000 WL 1448705 (S.D. Ind. March 31, 2000).  MFP's position has been that the lease was never assigned to LALR, but it also pled sufficiently in the alternative a claim against LALR for breach of the (assigned) lease.  MFP also pled claims against Dr. Reitz and Dr. Adams personally.  It is uncontested that LALR is in default on its lease obligations.

MFP argues that two of these eight factors are present:  undercapitalization and use of the limited liability form to promote fraud, injustice, or illegal activities. The amount of capital in LALR and LALR's obligations are both undisputed.  Reitz and Adams each contributed $12,500 in late April or early May 2006 to fund LALR.  LALR was created on March 3, 2006.  Its only obligation was the rent at The Pointe.  MFP argues that more than $2,000,000 remained to be paid over the life of the long-term lease, and that $25,000 is simply not sufficient capitalization. LALR responds that it needed no capital on a day to day basis because its only obligation, the lease, was subject to a sublease and was being paid by another tenant – AHN.  LALR functioned without problems during the one year that AHN subleased the property, apart from the issue regarding the March 2007 rent.

MFP's argument that the assignment of the lease to LALR was used to promote fraud or injustice essentially assumes the conclusion that LALR, AHN, and Dr. Reitz and Dr. Adams should be barred from acting as they did.  As explained above, nothing in the lease to which MFP was a party prohibited their actions.  The court is also not persuaded that LALR was undercapitalized, at least with respect to the long-term lease obligation.  MFP's argument seems to be that LALR should have had sufficient capital to assure payment of $2,000,000 in remaining long-term rent obligations.  There is no argument, however, that even AHN ever had such capital.  MFP is arguing in effect that it was entitled to have personal guarantees of the lease obligation.  The short answer is that if MFP or its predecessors wanted personal guarantees of the long-term obligations, then they

should have bargained for them.  They did not.  MFP is not entitled to such guarantees merely because AHN exercised its rights under the lease to assign the long-term obligations from one limited liability company (AHN) to another (LALR).

The court assumes that a reasonable trier of fact could find that LALR was created for the purpose of allowing Dr. Reitz and Dr. Adams to avoid personal liability for the lease that AHN wanted to assign to them.  That is a perfectly legitimate business goal, particularly since neither Dr. Reitz nor Dr. Adams had been personally liable for the original lease.  Because of tensions within AHN, AHN wanted to terminate its agreement with the two doctors and proposed assigning the lease to them as individuals.  At that point, Dr. Reitz and Dr. Adams proposed the creation of a limited liability company to receive the lease assignment.  This device reflected only sound economic planning.  A limited liability company is a perfectly permissible form for organizing a business in Indiana, and a primary benefit is that its members are not personally liable for the debts of the limited liability company.

MFP argues that factual questions preclude summary judgment on the issue of piercing the veil.  The case it cites, however, stands for the proposition that a *plaintiff* seeking to pierce the veil should not generally be granted summary judgment.  *Community Care Center, Inc. v. Hamilton*, 774 N.E.2d 559, 565 (Ind. App. 2002) (reversing summary judgment for plaintiff state agency that accused defendants of using the corporate form to commit Medicaid fraud).  It is true that

"[w]hen a court exercises its equitable powers to pierce the corporate veil, it engages in a highly fact-sensitive inquiry." *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1232 (Ind. 1994). The Indiana Supreme Court in *Winkler*, however, determined that no factual disputes were at issue and affirmed summary judgment for defendant.   In most instances, parties who have observed the formalities of the corporate (or limited liability company) form should be able to count on the promise of limited liability, and there will rarely be a sufficient factual basis for avoiding summary judgment on the issue based on a claim by a party who knew it was dealing with a limited liability company.

Here, the facts surrounding the capitalization and functioning of LALR are not in dispute.   The court also sees no issue of material fact concerning the assignment.   The lease gave AHN the absolute right to assign the lease to a business association formed by Dr. Reitz and/or Dr. Adams, leaving no further liability for AHN on the original lease.   Neither AHN nor Dr. Reitz nor Dr. Adams was required to guarantee that an assignee like LALR would be able to perform all of AHN's original obligations under the lease.

Reading the facts in a way most favorable to MFP, Dr. Reitz and Dr. Adams were in a dispute with AHN about the fact that they were bringing too little money into the practice.  A negotiation ensued whereby AHN assigned them the lease and agreed to sublease for a year.  The ability to get out of the original lease was of great value to AHN.  Accepting the assignment was undoubtedly beneficial to Dr.

Reitz and Dr. Adams in helping work out a settlement with AHN.  Dr. Reitz and
Dr. Adams could not have continued to pay the rent based on the proceeds of
their individual practices, particularly since Dr. Reitz had stopped working.  They
reasonably chose not to accept the personal assignment of the lease and instead
formed LALR.

Again, however, MFP never had any right to personal guarantees of the lease
obligations, and the lease itself allowed AHN to make the assignment in question.
That assignment still left MFP without any personal guarantees of the lease
obligations.  Landlords like MFP know how to obtain a personal guarantee if they
believe one is necessary.  Nothing in this record would allow a court to impose, in
effect, new personal guarantee obligations on Dr. Reitz or Dr. Adams.  Accordingly,
defendants are entitled to summary judgment on MFP's effort to hold Dr. Reitz
and Dr. Adams personally liable for the obligations of LALR.

*Conclusion*

For the foregoing reasons, AHN's motion for summary judgment (Dkt No. 58)
is granted on all issues except for one month's rent under the sublease.  LALR's
motion for summary judgment (Dkt. No. 55) is granted as to all claims other than
breach of the sublease and denied with respect to the breach of sublease.  MFP's
partial motion for summary judgment on breach of the sublease (Dkt. No. 59) is
denied, except for one month's rent.  This ruling should resolve all claims in the

case.  Counsel for defendants shall, after conferring with counsel for MFP, submit an appropriate form of judgment that will (a) hold AHN responsible for paying the March 2007 rent, with interest; and (b) dismiss all other claims by MFP.

So ordered.

Date: January 9, 2009

DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Douglas B. King
WOODEN & MCLAUGHLIN LLP
dking@woodmaclaw.com

Michael T. McNally
ICE MILLER LLP
mcnally@icemiller.com

Eileen P. H. Moore
ICE MILLER LLP
eileen.moore@icemiller.com

Richard Charles Richmond III
TAFT STETTINIUS & HOLLISTER LLP
rrichmond@taftlaw.com

Maureen E. Ward
WOODEN & MCLAUGHLIN LLP
mward@woodmaclaw.com

Michael A. Wukmer
ICE MILLER LLP
michael.wukmer@icemiller.com